1    **WO**

2

3

4

5

6                  IN THE UNITED STATES DISTRICT COURT

7                     FOR THE DISTRICT OF ARIZONA

8

9    Gary Donahoe and Cherie Donahoe,        No. CV10-2756-PHX-NVW
     husband and wife,

10                      Plaintiffs,           **CONSOLIDATED WITH:**

11   vs.

12   Sheriff Joseph Arpaio and Ava Arpaio,
     husband and wife; Andrew Thomas and
13   Anne Thomas, husband and wife; Lisa
     Aubuchon and Peter R. Pestalozzi, wife and
14   husband; Deputy Chief David Hendershott
     and Anna Hendershott, husband and wife;
15   Peter Spaw and Jane Doe Spaw, husband
     and wife; Maricopa County, a municipal
16   entity; Jon Does I-X; Jane Does I-X; Black
     Corporations I-V; and White Partnerships I-
17   V,

18                      Defendants.

19

20   Sandra Wilson and Paul Wilson, husband      CV10-2758-PHX-NVW
     and wife,

21                      Plaintiffs,

22   vs.

23   Sheriff Joseph Arpaio and Ava Arpaio,
     husband and wife; et al.,
24
                        Defendants.
25

26

27

28

                              - 1 -

| | |
|---|---|
| Conley D. Wolfswinkel, a single man; Brandon D. Wolswinkel, a single man; Ashton A. Wolfswinkel, a single man; Vanderbilt Farms, LLC, an Arizona limited liability company; ABCDW, LLC, an Arizona limited liability company; Stone Canyon, LLC, an Arizona limited liability company; Vistoso Partners, LLC, an Arizona limited liability company; and W Harquahala, LLC, an Arizona limited liability company;<br><br>Plaintiffs,<br><br>vs.<br><br>Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; et al.,<br><br>Defendants. | CV11-0116-PHX-NVW |
| Mary Rose Wilcox and Earl Wilcox, wife and husband,<br><br>Plaintiffs,<br><br>vs.<br><br>Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; et al.,<br><br>Defendants. | CV11-0473-PHX-NVW |
| Donald T. Stapley, Jr. and Kathleen Stapley, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; et al.,<br><br>Defendants. | CV11-0902-PHX-NVW<br><br>**ORDER** |

Before the Court is Plaintiffs Mary Rose and Earl Wilcox's Motion to Enforce Settlement Agreement and Stay Discovery Obligations (Doc. 355). The motion was argued and evidence taken on May 11, 2012 (Doc. 396). The Court gave an oral ruling

for Wilcox, with this written order to follow.  Wilcox's motion will be granted and judgment entered in accordance with the settlement agreement.

## I.      THE BINDING SETTLEMENT AGREEMENT

The "enforcement of [a] settlement agreement[]. . . [is] governed by general contract principles."  *Emmons v. Sup. Ct. in and for Cty. Of Maricopa*, 192 Ariz. 509, 512, 968 P.2d 582, 585 (Ct. App. 1998) (citing *Hisel v. Upchurch*, 797 F. Supp. 1509, 1517 (D. Ariz. 1992)).  In order to form an enforceable contract, "there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained."  *Savoca Masonry Co., Inc. v. Homes & Son Const. Co., Inc.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975). The "ultimate element of contract formation [is] the question whether the parties manifested assent or intent to be bound." *Schade v. Diethrich*, 158 Ariz. 1, 9, 760 P.2d 1050, 1058 (1988).  "Decisions on the making, meaning and enforcement of contracts should hinge on the manifest intent of the parties . . . ."  *Id.* at 8, n. 8, 760 P.2d at 1057, n. 8.

### A.      Wilcox's Claims

Mary Rose Wilcox is one of nine individual plaintiffs in these consolidated cases against Maricopa County, Sheriff Joseph Arpaio, his former Deputy Chief David Hendershott, former Maricopa County Andrew Thomas, his former deputy Lisa Aubuchon, and their spouses.

Wilcox is a member of the Maricopa County Board of Supervisors.  She alleges that Defendants used the power of the Maricopa County Sheriff's Office and the Maricopa County Attorney's Office to retaliate against her by targeting her for investigation, prosecution, and harassment without probable cause.  Wilcox also claims Arpaio and Thomas used an investigative division of the Sheriff's Office, the Maricopa Anti-Corruption Enforcement ("MACE") team, to target, investigate, harass, and intimidate her.

Wilcox claims Aubuchon and Hendershott, in association with the MACE unit, "began criminal investigations without probable cause, conducted fishing expeditions to

find evidence of crimes, and, finding none, falsified the law and evidence, and falsified the application of the law to the evidence to justify an investigative report recommending prosecution against . . . Wilcox."  (Doc. 239 at 6.)  Wilcox claims Defendants initiated a baseless criminal investigation against her in 2008, culminating in obtaining two criminal indictments against her in December 2009 and January 2010, as well as a baseless federal civil racketeering suit in 2009.  The criminal indictments were dismissed on February 24, 2010, after a finding that Thomas was using his office to retaliate against and gain political advantage over Wilcox and that Thomas and Arpaio misused the power of the Sheriff's Office to target Wilcox for criminal investigation.  Wilcox also alleges that Defendants took other actions to harm, intimidate, and humiliate her, including directing Sheriff's deputies to park outside her home and business and sending undercover informants into her business to make surreptitious tape recordings.

The Wilcox complaint raised nine causes of action: (1) Wrongful Institution of Civil Proceedings; (2) Malicious Prosecution against Arpaio and Hendershott; (3) Malicious Prosecution against Thomas and Aubuchon; (4) Intentional Infliction of Emotional Distress; (5) Violations of the Arizona Constitution; (6) Negligent Supervision; (7) 42 U.S.C. § 1983: Free Speech, Law Enforcement Retaliatory Conduct, Abuse of Process, and Abuse of Power; (8) 42 U.S.C. § 1983: Unconstitutional Policies, Customs, and Failure to Train; and (9) 42 U.S.C. § 1983: Conspiracy to Violate Constitutional Rights (Doc. 239).  Maricopa County has provided a defense to the other Defendants pursuant to its indemnification policy for county officers and employees. Wilcox also alleges that Maricopa County is liable for the liabilities of the individual Defendants under principles of federal and Arizona law, although the punitive damages sought against the individuals would not be a county obligation.

**B.     The County Manager Was Authorized To and Did Settle the Wilcox Claims**

The underlying events and the litigation in these consolidated cases have caused great controversy and turmoil in county government and in this community.  On June 23,

2010, the three disinterested members of the five-member Board of Supervisors adopted a resolution authorizing and directing the County Manager, David Smith, to resolve these lawsuits.  It said in part:

> WHEREAS, Maricopa County desires to expeditiously resolve all claims arising from the Acts of the Acting Parties in order to save time, taxpayers' money and turmoil . . .
>
> * * *
>
> . . . BE IT RESOLVED THAT:
>
> * * *
>
> . . . The County Manager is . . . directed and authorized to take all actions necessary to fully implement this resolution including, but not limited to, adjudicate the claims included in the alternative dispute resolution process, entering into binding arbitration/mediation agreements with claimants . . . entering into contracts as needed, conducting needed procurements, utilizing County funds as needed and similar actions.

(Doc. 356-1 at 4.)

Smith understood this Resolution as the Supervisors removing themselves from these settlements and delegating them to his efforts and decision.  Under general county policy, claims under $200,000 may be settled by county officers or its Risk Management department, but settlements above that amount require action by the Board of Supervisors for approval.  Although the Resolution does not address it directly, Smith understood the Resolution as authorizing him to settle these claims in the amounts he judged appropriate without specific approval of the Board of Supervisors, including for amounts above $200,000.  Further, the course of performance under the Resolution—specifically, Smith's settlement of Plaintiffs Mundell and Schuerman's claims for $500,000 each—confirms that Smith had authority to settle claims in excess of $200,000 without further Board approval.

At 7:30 a.m. on April 9, 2012, Wilcox's counsel, Colin Campbell, made an offer of settlement to County Manager David Smith through Christopher Skelly, who had assisted the parties as a mediator. (Doc. 356-1 at 7.) Skelly communicated that offer to Smith. At 3:08 p.m., Skelly sent the following email to Campbell:

> I write to confirm settlement: Defendants, through County Risk Management, will pay plaintiffs Wilcox $975,000 in exchange for a release, with usual and customary terms including a standard confidentiality provision to the extent permitted by law, and a stipulation for dismissal with prejudice of the litigation, each side to bear its own costs and fees. The settlement is subject to any further approvals deemed necessary by the parties. Steve will prepare the final settlement documents and get a check to Colin. Colin – Would you please get to Steve payee instructions, tax i.d. no., etc.?
>
> Please confirm your agreement to the above by replying to this e-mail in the form of an "okay" or something similar. That way we have a Rule 80(d) confirmation of the material settlement terms.
>
> If I've left anything out or misstated anything, please don't hesitate to correct me.

*Id.* At 3:29 p.m., Campbell sent a reply email stating, "We have an agreement." *Id.* That both parties intended the email exchange to be legally binding is persuasively, and indeed conclusively, established by the language that Campbell should "confirm [his] agreement to the above by replying to this e-mail in the form of an 'okay' or something similar. That way we have a Rule 80(d) confirmation of the material settlement terms." (Doc. 356-1 at 7.) Arizona Rule of Civil Procedure 80(d) provides, "No agreement or consent between parties or attorneys in any matter is binding if disputed, unless it is in writing, or made orally in open court, and entered in the minutes."

The County renounced the agreement, and on April 23, 2012, Wilcox filed this motion to enforce the settlement agreement (Doc. 355). After the County responded that no one intended a binding agreement, Wilcox requested an evidentiary hearing. The

Court ordered the County to produce Smith and Skelly to testify at a hearing on May 11, 2012 (Doc. 396).  Only Smith appeared.  He testified that he believed he had authority to settle Wilcox's claims, that he authorized Skelly to communicate the settlement offer intending it to be binding, and that he thought they had a binding settlement, subject to the "further approvals" language.[1]  (Doc. 436 at 41-42.)

---

[1] The Court credits Smith's testimony as follows:

> Campbell: Let's go back now to Exhibit Number B of Ms. O'Meara's declaration. First page of Exhibit Number B is the redacted offer I made, and I want you to turn to the next page. You will see we have, again, an e-mail from Mr. Skelly to me confirming a settlement with respect to Ms. Wilcox, correct?
>
> Smith:  Yes.
>
> Campbell: And you had given Mr. Skelly authority to communicate this settlement to me, correct?
>
> Smith:  I communicated to Chris the authority for a settlement in a certain amount but that also that there were concerns by the county attorney with regard to some related statutes that might be steps subsequent. And then I felt it appropriate to notify all parties that that possibility existed.
>
> Campbell: . . . Mr. Skelly had authority to communicate this offer to me, correct?
>
> Smith: Yes.
>
> Campbell: And you gave him full authority to do that?
>
> Smith: Yes.
>
> Campbell:  And you actually read what he communicated to me? You were copied on it?
>
> Smith: Yes.
>
> Campbell: Did he accurately state what you wanted him to communicate?
>
> Smith: Yes.
>
> Campbell:  And you see that I accepted the agreement as did Mr. Manning and Mr. Rivera, correct?

Smith had been retired for three weeks when he testified on May 11, 2012.  The Court finds Smith's testimony credible in every respect.  Indeed, there is only one respect in which any conflict to his testimony was offered.  On the day of the hearing, the County offered identical affidavits of Supervisor Kunasek and Supervisor Wilson, stating, "Mr. Smith was informed that any final settlement agreements, including the Wilcox settlement agreement, were subject to the Board of Supervisors' approval."  (Doc. 393-1 at 21, Doc. 394 at 7.)  Smith remembered no such statements (Doc. 436 at 52-53).[2]  Any such statements would have gone so fundamentally against Smith's understanding and his efforts for nearly two years that it is very unlikely he would forget such statements had they been made to him.  No doubt Smith routinely advised Board members of the status of his settlement efforts, but that is entirely different from him communicating to them or them communicating to him that he needed their further approval for any particular settlement.

Neither Supervisor Kunasek nor Supervisor Wilson appeared at the hearing to testify, give foundation of time, place, and circumstances for their statements, or subject themselves to cross-examination.  The Court accepted their affidavits and took them as true reflections of the present state of their memories.  However, based on the facts and circumstances here and the credibility of Smith's testimony, the Court finds their memories mistaken and Smith's correct.  The Court thus finds that, despite possible ambiguity in the text, the June 2010 Resolution delegated authority to the County Manager to settle these cases without limitation to $200,000 and without need for further

---

Smith:  Correct.

(Doc. 436 at 41-42.)

[2] At the May 11 hearing, Smith stated, "I don't recall . . . Mr. Wilson[] saying that [the settlement] needed to come back to him[,]" nor did he recall any conversation with Kunasek where Kunasek "indicated to [Smith] that any settlement with respect to the Wilcox claim needed to come back to the Board for approval[.]"  (Doc. 436 at 53.)

action of the Board of Supervisors.  The Court grounds this conclusion on the language of the Resolution, which is readily capable of this meaning, on Smith's testimony of his consistent understanding of which the Board never disabused him, on the Board's course of performance under the Resolution,[3] and on the apparent authority all this conduct communicated to Wilcox and her counsel.

The Court further finds that Wilcox and the County entered into a binding settlement agreement in the April 9, 2012 email exchanges.

### C.    The Qualification of Further Approval

The only issue raised is the meaning of the sentence: "This settlement is subject to any further approvals deemed necessary by the parties."  (Doc. 436 at 41-49.)   The County took the position in its response to Wilcox's motion that this sentence was "not limited to A.R.S. § 11-626 and, in fact, is much broader than just A.R.S. § 626."  (Doc. 374.)  However, the evidence does not support the County's position.

The motion to enforce the settlement states Wilcox's understanding that the "further approvals" language referred only to A.R.S. § 11-626 (Doc. 355 at 7).   Smith testified that the County Attorney had raised the objection that, notwithstanding the delegation of authority to the County Manager in the June 2010 Resolution, A.R.S. § 11-626 independently required written approval of the settlement by at least one disinterested member of the Board of Supervisors and consent of the County Treasurer (Doc. 435 at 44).  He further testified that the "further approvals" language thus "had to do with whether or not there was going to be a condition subsequent that before the payment could be paid, there would have to be the approval of another board member and the county treasurer."  (*Id.* at 45.)  Both parties therefore understood this language to refer only to whether A.R.S. § 11-626 needed to be satisfied.

---

[3] The Mundell and Schuerman settlements for $500,000 each were made at the same time and in the same way as the Wilcox settlement.  They were paid without further action by the Board of Supervisors.

Though the language in the abstract could have other meanings, the actual intent of both parties to the communications was the same: that A.R.S. § 11-626 must be inapplicable or satisfied.  *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993) ("[Where] parties use language that is mutually intended to have a special meaning, and that meaning is proved by credible evidence, a court is obligated to enforce the agreement according to the parties' intent, even if the language ordinarily might mean something different." (citing Restatement (Second) of Contracts § 212 cmt. b, illus. 3&4 (1981))).  Litigation over contract meaning happens when the parties attach different meanings to ambiguous language.  The law must then determine whether one party is chargeable with the other party's understanding or whether there was no contract at all.  *See, e.g.*, *McCutchin v. SCA Servs. Of Ariz., Inc.*, 147 Ariz. 234, 709 P.2d 591 (Ct. App. 1985).  This is a most unusual lawsuit in which both parties attached the same meaning to the contractual language, but the County seeks to escape its contract on the basis that the language could support a meaning neither party had.  That has no basis in our contract law.

### 1. The County Conceded that A.R.S. § 11-626 Required No Further Approval

Wilcox moved to enforce the settlement agreement on the basis that A.R.S. § 11-626 does not apply to tort claims or to this case (Doc. 355).  In its Response (Doc. 374), the County declined to brief the issue.  Rather, the County argued only that the language "This settlement is subject to any further approvals deemed necessary by the parties" excluded any present intent to be bound by either party.  The County's failure to respond concerning A.R.S. § 11-626 was a concession that A.R.S. § 11-626 does not apply and therefore does not qualify the settlement in this case.  Moreover, at oral argument the County conceded any reliance on A.R.S. § 11-626.[4]  The County is bound by its abandonment and its concession.

---

[4] The County's concession appears as follows:

The Court:  First, Mr. LaMar, your brief does not argue that Arizona Revised

2.      **A.R.S. § 11-626's Requirement of Approval by One Supervisor and the County Treasurer Does Not Apply to Tort Claims**

Even without the County's concession, the county claims statutes and A.R.S. § 11-626 in particular do not apply to tort claims.

"The Arizona county claims statutes have been basically the same since 1890." *Norcor of Am. v. S. Ariz. Int'l Livestock Ass'n*, 122 Ariz. 542, 543, 596 P.2d 377, 378 (Ct. App. 1979). The Arizona county claims statutes are found in A.R.S. § 11-621 through § 11-645. With some exceptions, they require a demand on the Board of Supervisors and "an itemized claim executed by the person under penalties of perjury, stating minutely what the claim is for, specifying each item, the date and amount of each item of the claim." A.R.S. § 11-622(A). "The board of supervisors shall not pay any claim unless

---

Statutes 11-626 has any application to this case. I suppose I could take that as an admission, but I want to be clear. You are not contending that, are you?

Mr. LaMar: I did not make that argument, Your Honor.

. . .

The Court: . . . I think that eliminates one issue, I think in this case, that this is the plaintiffs' original contention, and I take it now is explicitly conceded that A.R.S. Section 11-626 did not apply to this alleged settlement and, therefore, would not have been needed to be required with -- to effectuate any settlement. Correct?

Mr. LaMar: What I am conceding is that for purposes of this motion, we have not made that argument because we don't believe the Court needs to get there.

The Court: Oh, I'm getting there. So I'm asking you substantively, does the statute apply so as to require approval of the county treasurer and at least one member of the Board of Supervisors to this alleged settlement?

Mr. LaMar: Having not argued the position, Your Honor, I am saying for the record, on behalf of Maricopa County, that you can assume for purposes of this argument that it does not apply.

The Court: I take that as conceded, and we will move on to other things.

(Doc. 436 at 6-7.)

demand for payment is made within six months after the last item of the account accrues."  A.R.S. § 11-622(B).  "A demand in which a county officer is personally interested, or arising out of a contract to which a county officer while in office has been a party or otherwise personally interested, shall not be approved, allowed, or paid, and every such contract, claim or demand is null and void, except for official compensation of the persons in whose name it is presented."  A.R.S. § 11-627.

Previously, claims by members of the Board of Supervisors had to be "verified as other claims, and they shall be audited, allowed or rejected by the county recorder." Arizona Code of 1939, §17-324.  In 1941, that section was amended and now reads:

> A claim against the county presented by a member of the board of supervisors shall be verified as other claims, and shall bear the written approval of at least one member of the board other than the claimant, and of the county treasurer.

A.R.S. § 11-626, 1941 Ariz. Sess. Laws, ch. 18.  This change required approval by at least one disinterested member of the Board and by the County Treasurer instead of the County Recorder.  The 1941 enactment also amended Arizona Code of 1939, § 17-325, which generally made members of the Board of Supervisors and the claimant personally liable for payments made without authority of law.  For unlawful payments to a member of the Board of Supervisors, the addition made "the supervisor presenting the claim, and the supervisors and the county treasurer approving the claim . . . jointly and severally liable for the money" with interest and a 20% penalty.  Arizona Code of 1939, § 17-325(a) (Supp. 1952).  That statute, which has now eliminated the personal liability of the County Treasurer, carries forward as A.R.S. § 11-641.

These statutes refer to claims and demands in contract, not tort.  They speak to "an itemized claim . . . specifying each item, the date and amount of each item of the claim." The six-month limitation is measured from the "last item of the account."  The County Recorder or County Treasurer can examine county contracts and records and proofs for contract claims, but they have nothing to examine for tort claims.  The voiding of a

demand in which a county officer is personally interested ". . . except for official compensation" prevents county officers from doing business with the county. *Yuma County v. Fid. Title Guar. Co.,* 24 Ariz. 33, 206 Ariz. 587 (1922).   If tort claims come within this chapter, this section would give the County free run of torts against its officers because it prohibits the County from paying the claims.  These statutes reach no such absurd result for tort claims.

When the legislature said in 1941 that the County Treasurer and one board member must approve claims by another board member, it was well understood that statutory regimes like this are for contract claims, not tort claims.  The Arizona Supreme Court had recently construed a Phoenix City Charter provision, taken directly from the county claims statutes, as not applying to tort claims.  In *City of Phoenix v. Mayfield*, 41 Ariz. 537, 20 P.2d 296 (1933), the court held a wrongful death claim not subject to the City's mandatory demand and proof process for "any claim in favor of any person against the City . . . except claims of officers and employees of the City for their salaries."  *Id.* at 543, 20 P.2d at 298.   The court explained:

> Unquestionably a claim or demand of the kind described must be made out in the manner and form provided and presented to the city manager "within six months after the last item of the account accrued," but the whole context of said section 14 shows that the claims or demands referred to are those growing out of contract and not tort.  If the claim or demand be for labor or goods or merchandise furnished the city, it must be itemized and verified and presented within six months after the last labor or after the last item of merchandise became due.  Damages for unlawful death or personal injuries are not described by items accruing at different times, nor can they be itemized in an "account" and their "correctness" verified, nor can they be described as "due" the claimant as a debt.  *Miller v. Village of Mullan*, 17 Idaho 28, 104 Pac. 660, 19 Ann. Cas. 1107.   A proper statement of the rule is found in 43 Corpus Juris 1190, section 1958, as follows:

> "As a general rule charter or statutory provisions requiring notice or presentation of 'debts,' 'claims,' or 'demands,' without otherwise specifying their nature, and especially when accompanied by a requirement that such claim, etc., be itemized, apply only to actions *ex contractu*, and not to actions for tort; and the same is true in respect of a statute requiring presentation of 'accounts' against the municipality."

*Id*. at 543-44, 20 P.2d at 299.  The Court of Appeals has taken the reasoning of *Mayfield* as applying equally to the county claims statutes that were replicated in the Phoenix City Charter provision:

> What "claims" must be presented to the county?  We can best begin the answer to this question by setting forth the claims which need not be presented.  They are:
>
> . . .
>
> 5.    Claims for damages incurred by tort.  *City of Phoenix v. Mayfield*, 41 Ariz. 537, 20 P.2d 296 (1933).3/
>
> 3/    The city charter provision was similar to A.R.S. Secs. 11-621(A) and 11-622.

*Norcor*, 122 Ariz. at 543-44 & n. 3, 596 P.2d at 378-79 (dictum).

Because tort claims like Wilcox's do not come within the county claims statutes, the special approval requirement of A.R.S. § 11-626 does not apply.  Delegation to the County Manager by the disinterested majority of the Board of Supervisors in the June 2010 Resolution, and Smith acting on that authority, was all that state law required to make a binding contract of settlement with Wilcox.

## II.    THE MEDIATION PRIVILEGE OF A.R.S. § 12-2238 DOES NOT PRECLUDE TESTIMONY OR ENFORCEMENT OF A WRITTEN OFFER AND ACCEPTANCE INTENDED TO BE BINDING, EVEN IF CONVEYED THROUGH A PERSON WHO ALSO SERVED AS A MEDIATOR

The County objected to Smith's testimony that he authorized Skelly to offer and receive acceptance of a binding settlement and what Smith meant by it.  The County

demanded that the abstract textual ambiguity of the qualification of further approvals defeat inquiry into what the parties actually meant, even though they meant the same thing.   The County argues that this evidence and the enforcement of the written agreement are barred by A.R.S. § 12-2238, the Arizona mediation privilege statute.   The statute states in relevant part:

> B.      The       mediation       process       is       confidential.
> Communications made, materials created for or used and acts
> occurring during a mediation are confidential and may not be
> discovered or admitted into evidence unless one of the
> following exceptions is met:
>
> 1.  All of the parties to the mediation agree to the disclosure.
>
> 2.  The communication, material or act is relevant to a claim
> or defense made by a party to the mediation against the
> mediator or the mediation program arising out of a breach of
> a legal obligation owed by the mediator to the party.
>
> 3.  The disclosure is required by statute.
>
> 4.   The disclosure is necessary to enforce an agreement to
> mediate.
>
> . . .
>
> D.      Notwithstanding subsection B, when necessary to
> enforce or obtain approval of an agreement that is reached by
> the parties in a mediation, the terms of an agreement that is
> evidenced by a record that is signed by the parties are not
> confidential.   The agreement may be introduced in any
> proceeding to obtain court approval of the agreement, where
> required by law, or to enforce the agreement.   If a party
> requests that all or a portion of the agreement remain
> confidential, the agreement may be disclosed to the court
> under seal with a request to issue appropriate orders to protect
> the confidentiality of the agreement, as permitted by law.
>
> . . .
>
> G.      For purposes of this section:

- 15 -

1       1.  "Mediation" means a process in which parties who are
2   involved in a dispute enter into one or more private settlement
3   discussions outside of a formal court proceeding with a
    neutral third party to try to resolve the dispute.

4       A.R.S. § 12-2238 may not apply of its own force in this case.  Federal Rule of

5   Evidence 501 supplants state privilege law to the extent state law does not supply the rule

6   of decision on the claims or defenses.[5]  But perhaps it does apply since the claim here is

7   for making and breaking a contract, not for the underlying federal claims.  The Court

8   need not decide what federal rule of privilege might supplant A.R.S. § 12-2238 because

9   the state statute does not bar evidence of the written email agreement or of Smith's

10  testimony that his intent and understanding was the same as Campbell's.

11      The statute does not apply because the written exchange and the matters testified

12  to were not "during a mediation" as the statute defines mediation.  A.R.S. § 12-2238(B)

13  and (G)(1).  They occurred after "private settlement discussions . . . with a neutral third

14  party to try to resolve the dispute" and when the parties had passed into conscious and

15  formal contract formation.  A.R.S. § 12-2238(G)(1).  Written offers and acceptances of

16  settlement agreement, on their face expressing intent to be bound, fall outside the

17  mediation privilege, even if the person who was the mediator is a witness to or conduit

18  for them.  As one court has explained:

19      [C]ommunications to the mediator and communications
20  between parties during the mediation are protected. In
    addition, communications in preparation for and during the
21  course of a mediation with a neutral must be protected.
    Subsequent negotiations between the parties, however, are not
22  protected even if they include information initially disclosed
23  in the mediation. To protect additional communications, the
    parties are required to return to mediation. A contrary rule

24

25  [5] Federal Rule of Evidence 501 provides: "The common law--as interpreted by United
26  States courts in the light of reason and experience--governs a claim of privilege unless
    any of the following provides otherwise: the United States Constitution; a federal statute;
27  or rules prescribed by the Supreme Court. But in a civil case, state law governs privilege
    regarding a claim or defense for which state law supplies the rule of decision."
28

1
2

> would permit a party to claim the privilege with respect to
> any settlement negotiations so long as the communications
> took place following an attempt to mediate the dispute.

3
4

*Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1180 (C. D.

5

Cal. 1998) (California law); *accord United States Fid. & Guar. Co. v. Dick Corp./Barton*

6

*Malow, et al.*, 215 F.R.D. 503 (W. D. Pa. 2003) ("The mere fact that discussions

7

subsequent to a mediation relate to the same subject as the mediation does not mean that

8

all documents and communications related to that subject are 'to further the mediation

9

process' or prepared for the purpose of, in the course of, or pursuant to mediation.")

10

(Pennsylvania law).  A mediator cannot by his presence purvey immunity from contract

law when the prelude of negotiation has passed and the deal is made.

11
12

Indeed, this general boundary between mediating and contracting is affirmed in

13

the very text of A.R.S. § 12-2238, in language that fits this case exactly.  Subsection D

14

states that when necessary "to enforce or obtain approval of an agreement that is reached

15

by the parties in a mediation, the terms of an agreement that is evidenced by a record that

16

is signed by the parties are not confidential.  The agreement may be introduced in any

17

proceeding to obtain court approval of the agreement, where required by law, or to

18

enforce the agreement."  The emails were in writing and signed by the parties (Campbell

19

by affixing his name to his emails, Skelly doing the same with authorization of Smith for

20

the County).  The mutual intent that the agreement be legally binding immediately upon

21

email acceptance is explicitly stated in the reference to satisfying Rule 80(d) of the

Arizona Rules of Civil Procedure.

22
23

Upon the County's eve-of-court assertion that the further approval language

24

precluded any intent to be bound, parole evidence became proper to "'ascertain and give

25

effect to the intention of the parties at the time the contract was made[.]'"  *Taylor*, 175

26

Ariz. at 154, 854 P.2d at 1140  (quoting *Polk v. Koerner*, 111 Ariz. 493, 495, 533 P.2d

27

660, 662 (1975)).  "Where the written language of the agreement offers more than one

reasonable interpretation, the surrounding circumstances at the time that it was made

28

should be considered in ascertaining its meaning." *Polk*, 111 Ariz. at 495, 533 P.2d at 662.  Smith's testimony, refuting the County's assertion of what was meant, was not excluded by the statute.

For these reasons, the County's objections to evidence under A.R.S. § 12-2238 are overruled.

## III.    WILCOX WILL BE AWARDED ATTORNEY FEES AND COSTS UNDER A.R.S. § 12-341-01(A).

Wilcox claims under A.R.S. § 12-341.01(A) an award of attorney fees and costs caused by the County's breach of the settlement agreement.  On May 17, 2012, the parties stipulated that the reasonable amount is $27,222.00 in fees and $1,089.56 in costs (Doc. 428).  Those fees and expenses will be assessed against the County, as Wilcox is the prevailing party in a case arising out of contract.  Considering all the discretionary factors under that statute, justice requires this award to mitigate the expense of remedying the County's breach of the settlement agreement.

## IV.    ORDER

IT IS THEREFORE ORDERED that Plaintiffs Mary Rose and Earl Wilcox's Motion to Enforce Settlement Agreement and Stay Discovery Obligations (Doc. 355) is granted.

IT IS FURTHER ORDERED that final judgment be entered by separate document in favor of Plaintiffs Mary Rose and Earl Wilcox against Defendant Maricopa County in accordance with the settlement agreement made April 9, 2012, as follows:

A.    Plaintiffs Mary Rose and Earl Wilcox shall have judgment against Defendant Maricopa County for:

1.    $975,000.00 in principal damages and

2.    $27,222.00 in attorney fees and $1,089.56 expenses since April 9, 2012, and

3.    interest on the foregoing amounts at the federal rate of .21% per annum from the date of judgment until paid.

1    B.    Except for the rights expressly stated in this judgment, all claims of
2          Plaintiffs Mary Rose and Earl Wilcox that are brought or could have been
3          brought in this action against any Defendant and that arise out of the
4          transactions or occurrences alleged in this action are extinguished.
5    C.    Other than as expressly provided in this judgment, the parties shall bear
6          their own costs and attorney fees.
7          IT IS FURTHER ORDERED that the Court reserves jurisdiction to decide the
8    Motion to Intervene (Doc. 444), which is not fully briefed, and Wilcox's claim for
9    additional attorney fees award against Maricopa County on that motion.
10         The Clerk shall terminate Case No. CV11-0473-PHX-NVW.
11         Dated this 1st day of June, 2012.

                          _____
                                   Neil V. Wake
                            United States District Judge

- 19 -