**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Gary Donahoe and Cherie Donahoe, husband and wife, | No. CV-10-02756-PHX-NVW |
| Plaintiffs, | **CONSOLIDATED WITH:** |
| v. | |
| Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; Andrew Thomas and Anne Thomas, husband and wife; Lisa Aubuchon and Peter R. Pestalozzi, wife and husband; Deputy Chief David Hendershott and Anna Hendershott, husband and wife; Peter Spaw and Jane Doe Spaw, husband and wife; Maricopa County, a municipal entity; Jon Does I-X; Jane Does I-X; Black Corporations I-V; and White Partnerships I-V, | |
| Defendants. | |
| Donald T. Stapley, Jr. and Kathleen Stapley, husband and wife, | No. CV-11-0902-PHX-NVW |
| Plaintiffs, | **ORDER** |
| v. | |
| Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; et al., | |
| Defendants. | |

1

TABLE OF CONTENTS

2

3   I.   SUMMARY OF RULINGS .................................................................. 1

4   II.   LEGAL STANDARD .................................................................. 3

5   III.   *STAPLEY I* .................................................................................. 4

6
    A.   Legal standard .................................................................. 4
7
8   B.   Probable cause .................................................................. 5

9       1.   The 1994 Board of Supervisors resolution ........................... 6

10      2.   Statute of limitations .................................................... 9
11
12  C.   Malice .............................................................................. 10

13  D.   Favorable termination .......................................................... 11

14  E.   Accrual of action .............................................................. 12

15  IV.   THE SEARCH .......................................................................... 12

16  A.   Legal standard .................................................................. 13
17
18  B.   Evidence supporting the search warrant ................................... 14

19      1.   Evidence regarding fraud ................................................ 15

20      2.   Evidence regarding bribery .............................................. 16

21      3.   Evidence regarding misuse of public funds ........................... 17
22
23  C.   Misrepresentations and omissions in the supporting affidavit ............ 19

24      1.   Misrepresentation and omissions of evidence of bribery ............... 19

25          i.    Review of bank records.............................................. 19

26          ii.   Partnership documents .............................................. 20

27          iii.  Public records of partnership ...................................... 20
28
            iv.   Disclosure............................................................ 21

v.     Voting record ................................................................ 21

2.     Misrepresentation and omissions of evidence of misused public funds ............. 23

D.     Materiality of misrepresentations and omissions .................................. 24

E.     Deliberate or reckless disregard for the truth .................................. 26

1.     Aubuchon ...................................................................... 27

i.     Involvement................................................................. 27

ii.    Evidence.................................................................... 28

2.     Thomas ........................................................................ 31

3.     Hendershott.................................................................... 32

4.     Arpaio ........................................................................ 34

F.     Qualified immunity ............................................................. 35

1.     Legal standard ................................................................ 35

2.     Application to the search ..................................................... 36

V.     THE ARREST AND *STAPLEY II* INDICTMENT.......................................... 36

A.     Legal standard ................................................................ 38

B.     Probable cause ................................................................ 39

1.     Fraudulent schemes and artifices (arrest)...................................... 40

2.     Perjury (arrest and indictment)................................................ 42

3.     False swearing (indictment) ................................................... 43

C.     Defendants' roles in the arrest................................................ 44

D.     Malice or improper purpose in prosecuting *Stapley II*......................... 45

E.     Favorable termination.......................................................... 46

F.     Qualified immunity for the arrest ............................................. 47

VI.    THE RACKETEERING ACTION ........................................................ 48

    A.   Background.............................................................................. 48

    B.   Legal standard ........................................................................ 51

    C.   Analysis .................................................................................. 51

        1.   Involvement ...................................................................... 51

        2.   Probable cause (reasonable belief and advice of counsel) ............................... 52

        3.   Malice ............................................................................... 53

        4.   Favorable termination....................................................... 54

VII.   RETALIATION AND QUALIFIED IMMUNITY ............................... 55

    A.   Constitutional violation .......................................................... 56

    B.   Clearly established right.......................................................... 58

XIII.  ABSOLUTE IMMUNITY ............................................................... 60

    A.   Legal standard ........................................................................ 61

    B.   Analysis .................................................................................. 61

IX.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND PUNITIVE DAMAGES ......................................................................... 63

    A.   Legal standard ........................................................................ 63

    B.   Analysis .................................................................................. 64

X.     UNCONSTITUTIONAL POLICIES OR CUSTOMS ........................ 64

XI.    PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT ............... 64

Before the Court are seven motions for summary judgment filed by Plaintiff Donald T. Stapley, Jr. and Defendants Joseph Arpaio, Lisa Aubuchon, David Hendershott, and Andrew Thomas.  For the following reasons, Plaintiff's motions will be denied and Defendants' motions will be granted in part and denied in part.

## I.    SUMMARY OF RULINGS

The allegations underlying this dispute are set forth in *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020 (D. Ariz. 2012), *aff'd sub nom. Stapley v. Pestalozzi*, 733 F.3d 804 (9th Cir. 2013).  They describe an extended criminal and civil campaign against the Maricopa County Board of Supervisors, of which Stapley was then a member, by the Maricopa County Sheriff's Office (MCSO), the Maricopa County Attorney's Office (MCAO), and their joint anti-corruption task force (MACE).  The details are not recounted here except as necessary to explain the rulings.  Stapley has now moved for partial summary judgment against Sheriff Joseph Arpaio (Doc. 1060), former Deputy County Attorney Lisa Aubuchon (Doc. 1065), and former Chief Deputy David Hendershott (Doc. 1056).  In turn, Arpaio (Doc. 1062), Aubuchon (Doc. 1066), Hendershott (Doc. 1072), and former County Attorney Andrew Thomas (Doc. 1063) have moved for summary judgment.  Stapley's motion for partial summary judgment against Thomas (Doc. 1147) and Maricopa County's motion for summary judgment against Stapley (Doc. 1149) were previously denied.

Stapley seeks summary judgment that

(1)    Arpaio ordered a retaliatory arrest in violation of 42 U.S.C. § 1983;

(2)    Aubuchon engaged in judicial deception and searched his office in violation of 42 U.S.C. § 1983; and

(3)    Hendershott wrongfully instituted a federal racketeering action against him in violation of state law and 42 U.S.C. § 1983.

- 1 -

All Defendants seek summary judgment that

    (1)    they are not liable for maliciously prosecuting or investigating Stapley in the criminal actions commonly referred to as *Stapley I* and *Stapley II*;

    (2)    they are not liable for retaliating against Stapley for exercising his constitutional rights;

    (3)    they are not liable for the search of Stapley's office;

    (4)    they have absolute or qualified immunity as to various claims;

    (5)    they are not liable for intentional infliction of emotional distress; and

    (6)    Stapley may not recover punitive damages.

Arpaio, Aubuchon, and Hendershott also seek summary judgment that they are not liable for Stapley's arrest.

Arpaio and Hendershott also seek summary judgment that

    (1)    their roles in the federal racketeering action do not give rise to liability; and

    (2)    they are not liable for establishing unconstitutional policies or customs within MCSO, for failing to train employees, or for negligently supervising them.

The Defendants' motions for summary judgment will be granted against the following claims.

As to Defendant Arpaio, summary judgment will be granted against Stapley's ninth claim for unconstitutional policies, customs, failure to train, and negligent supervision.

As to Defendant Aubuchon, summary judgment will be granted against Stapley's second and fifth claims for malicious prosecution and against his fourth claim for false arrest.

As to Defendant Hendershott, summary judgment will be granted against Stapley's ninth claim for unconstitutional policies, customs, failure to train, and negligent supervision.

As to Defendant Thomas, summary judgment will be granted against Stapley's second and fifth claims for malicious prosecution and against his tenth claim for unlawful search.

The motions will otherwise be denied.

## II.     LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial.  At its core, it questions whether sufficient evidence exists from which a reasonable jury could find in favor of the party opposing the motion for summary judgment.  Summary judgment should be granted if the evidence shows there is no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the burden of demonstrating that no material issue of fact exists for the jury to decide.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim but need not produce evidence negating that claim.  *Id.* at 325.

When the moving party has carried its burden under Federal Rule of Civil Procedure 56(c), the nonmoving party must show that there are genuine issues of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A material fact is one that might affect the outcome of the suit under the governing law, and a factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255.  Where the record,

1    taken as a whole, could not lead a rational trier of fact to find for the nonmoving party,

2    there is no genuine issue of material fact for trial.  *Matsushita*, 475 U.S. at 587.

3        On summary judgment, the nonmoving party's evidence is presumed true, and all

4    inferences from the evidence are drawn in the light most favorable to the nonmoving

5    party.  *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987);

6    *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001).  But the evidence

7    presented by the parties must be admissible or able to be produced in admissible form.

8    *See* Fed. R. Civ. P. 56(c)(2).  Conclusory and speculative testimony in affidavits and

9    moving papers is insufficient to raise genuine issues of fact and to defeat summary

10   judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

11

12   **III.    *STAPLEY I***

13       On November 20, 2008, a grand jury returned a 118-count indictment against

14   Stapley (*Stapley I*), charging him largely with violations of disclosure laws related to his

15   position as a Maricopa County Supervisor.  *See* Doc. 1112-9 at 26.  On December 2, an

16   MCSO sergeant served Stapley with the summons.  *See id.* at 29.

17       Stapley seeks damages for malicious prosecution based on the investigations that

18   led to this indictment—his third claim for relief.  Stapley no longer asserts separate

19   malicious prosecution claims against Thomas and Aubuchon, which the Court has held

20   absolutely immune from suit.  Thus, Arpaio and Hendershott are the only remaining

21   defendants with respect to the malicious prosecution claims.  Each moves for summary

22   judgment.

23

24       **A.    Legal standard**

25       For malicious prosecution under Arizona law, Stapley must prove (1) Defendants

26   initiated or procured the criminal proceeding, (2) the prosecution terminated in Stapley's

27   favor, (3) the prosecution lacked probable cause, and (4) malice, or a primary purpose

28   other than bringing him to justice.  *See* Restatement (Second) of Torts § 653 (1977); *see*

*also Frey v. Stoneman*, 150 Ariz. 106, 109, 722 P.2d 274, 277 (1986). "A criminal defendant may maintain a malicious prosecution claim not only against prosecutors but also against others—including police officers and investigators—who wrongfully caused his prosecution." *Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011).

Notably, "a malicious prosecution claim is treated differently from one for false arrest: whereas probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause, . . . probable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking." *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007) (internal citations omitted); *accord Jernigan v. Richard*, 907 F. Supp. 2d 998, 1041 (D. Ariz. 2012) (upholding malicious prosecution claim where probable cause supported some—but not all—of the criminal counts charged against plaintiff).

### B.  Probable cause

Both Arpaio and Hendershott assert the existence of probable cause. "In the context of malicious prosecution, probable cause is defined as 'a reasonable ground of suspicion, supported by circumstances sufficient to warrant an ordinarily prudent man in believing the accused is guilty of the offense . . . . The test generally applied is: upon the appearances presented to the defendant, would a reasonably prudent man have instituted or continued the proceeding?'" *Gonzales v. City of Phoenix*, 203 Ariz. 152, 155, 52 P.3d 184, 187 (2002) (quoting *McClinton v. Rice*, 76 Ariz. 358, 367, 265 P.2d 425, 431 (1953)). The question of probable cause is generally one for the court. *Gonzales*, 203 Ariz. at 155, 52 P.3d at 187. "If, however, the evidence is conflicting, so that on one conclusion as to the facts drawn therefrom probable cause exists, while from another it does not, it is then for the jury to determine the true state of facts and to apply the law as laid down by the court to those facts." *Sarwark Motor Sales, Inc. v. Woolridge*, 88 Ariz. 173, 177, 354 P.2d 34, 36 (1960). Summary judgment is appropriate if a reasonable jury

could not find an absence of probable cause based on the undisputed facts.  *See, e.g.,* *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994).

### 1.      The 1994 Board of Supervisors resolution

The *Stapley I* charges were premised on Stapley's knowing failure to disclose financial transactions as required by state law.  As early as January 2007, Special Deputy County Attorney Mark Goldman—a volunteer attorney with MCAO—and MCSO Sergeant Brandon Luth began investigating Stapley.  *See* Doc. 1112-6 at 74–75; Doc. 1112-14 at 132; 1112-3 at 75.  Thomas either directed Goldman to search public records regarding Stapley's relationship with another lawyer, Tom Irvine, or approved Goldman voluntarily undertaking the task.  *Compare* Doc. 1112-6 at 74–75 *with id.* at 90.  Luth was ordered by Hendershott to "start looking into [Stapley's] business dealings and [other] matters."  Doc. 1112-3 at 75.

The parties dispute the origin of the investigation.  There is evidence that "[t]here was no traditional complainant for any of the investigations concerning Supervisor Stapley" and instead that the investigations "spawned from Thomas'[s] directive to Goldman to search public records to find evidence of a crime."  Doc. 1112 ¶¶ 122, 132; *see also* Doc. 1112-9 at 6 (MCAO employee suggesting Thomas decided to investigate Stapley in response to news reports regarding Stapley).  *But see* Doc. 1112-6 at 108–11 (Thomas testifying that Goldman volunteered to research Stapley's financial relationship with Irvine after Thomas received a tip about potential wrongdoing between Stapley and Irvine); Doc. 1142 ¶ 122 (Arpaio also stating there was a complainant in the earlier investigation regarding Irvine).

By May 2007, Goldman informed Thomas of potential issues with Stapley's records and then informed MACE at Thomas's direction.  *See* Doc. 1112-6 at 113–14, 117–18.  No further action appears to have been taken until March 2008[1] when

---

[1] As discussed below, Stapley has offered evidence that his public criticism of Thomas motivated revival of the investigation.

Aubuchon took over Goldman's research, learned from him that there were "issues" with Stapley's records, and concluded there were criminal nondisclosures. *See* Doc. 1112-8 at 11–15.  When Aubuchon received Goldman's research, she noted that they were time stamped from early 2007. *See id.* at 15.  She then met with MACE deputies on May 14, 2008, *see id.* at 25–26, presented a draft indictment dated May 29, *see id.* at 22, and told the deputies to use May 14 as the date on which the investigation started. *See* Doc. 1112-3 at 88.

On May 8, 2009, Thomas enlisted MCAO Commander Mark Stribling to assist the investigation. *See* Doc. 1112-9 at 5.  At Aubuchon's suggestion, Stribling contacted Fran McCarroll, the Clerk of the Board of Supervisors, to "get some documents about resolutions that the board had passed related to how disclosures were done because apparently throughout the years the way disclosures were handled had changed some." *Id.* at 17.  Because MCAO sought to indict Stapley for violating the 1994 Maricopa County rule or resolution applying state disclosure rules to *county* officers, his criminal culpability turned on whether the Board's 1994 resolution had in fact adopted state law.

On May 22, 2008, McCarroll informed Stribling that the Board had in fact adopted a resolution "consistent with [state law]." Doc. 1069-2 at 3.  Stribling informed Luth of this the same day, and Luth entered it into an MCSO supplemental report. *Id.* at 2.  Indeed, McCarroll "confirmed that elected county officials, including the Board of Supervisors, were required to file financial disclosure statements with her office." Doc. 1073 at 2.  McCarroll also provided copies of past Board minutes.  These reflect that the Board resolved to adopt the disclosure requirements in 1974 and amended the requirements in 1979.  They further reflect that in 1994 the Board resolved to *rescind* the 1979 resolution "and update the Financial Disclosure form for Elected Officials to bring the form and process into compliance with A.R.S. 38-541." Doc. 1112 ¶ 110 ("Financial disclosure forms must be filed by January 31, each year, with the Clerk of the Board.").  Stribling appears to have provided these documents to Luth, and it appears that somebody created a handwritten timeline on one of these documents indicating that the Board

rescinded the 1979 resolution.  *See* Doc. 1069-2 at 4 ("1994—Rescind reso re: <u>Exempt</u> employees & update Fin. Disc. Form").  Notwithstanding the Board's apparent intent to update its disclosure protocol, the Board's 1994 resolution did not adopt state law requiring disclosures.  *See State v. Stapley*, 227 Ariz. 61, 65–66, 251 P.3d 1048, 1052–53 (Ct. App. 2011).

MCSO deputies obtained Stapley's financial disclosures and discovered evidence that Stapley had "omitted information in his required disclosures for thirteen years, from 1994 through 2007."  Doc. 1072 at 4.  Aubuchon presented the case to a grand jury, *see* Doc. 1112-9 at 50, which returned a 118-count indictment against Stapley "in connection with false and/or incomplete financial disclosures he filed," Doc. 1072 at 4, in violation of "A.R.S §§ 38-542, 38-542(A)(5), 38-544, 38-541, 38-545, 13-707, 13-802, and Maricopa County Rule or Resolution adopted January 20, 1994."  *Stapley*, 227 Ariz. at 64 n.4, 251 P.2d at 1051 n.4.

Here, there is a factual dispute as to what MCSO and MCAO officials believed and when they believed it.  Aubuchon presented *Stapley I* to the grand jury in November 2008, six months after McCarroll disclosed the relevant documents and communicated her belief regarding the disclosure requirements to Stribling.  At the grand jury hearing, a state witness explained that "there's a resolution by the county that was adopted in '94 that requires county officials to comply with the Arizona statute 38-542, which requires those disclosures be completed."  Doc. 1112-9 at 50.  Aubuchon asked whether the resolution "address[ed] candidate disclosure forms" and the witness responded that "[i]t wasn't clearly covered under the resolution."  *Id.*

Even if McCarroll actually believed the 1994 resolution adopted the disclosure requirements—and it appears she did—MACE had six months to review the language of the 1994 resolution and conduct further investigation as to whether the intention reflected in the 1994 resolution was ever acted on (it was not).  It is clear that someone handwrote on the documents McCarroll disclosed to Stribling that the 1994 resolution rescinded the 1979 resolution, but it is unclear whether the author of those notes appreciated the impact

of the 1994 resolution—the grand jury testimony quoted above suggests it was either misunderstood or deliberately ignored.  Further, it is unclear who wrote it or when.  If everyone believed that the resolution had been adopted at the time Aubuchon presented the indictment to the grand jury—because that is what McCarroll told them—then an ordinarily prudent person may have continued the investigation.  But it is at best a matter of debate, and therefore jury trial, whether it was reasonable to seek indictment without ever seeing the supposed resolution to confirm its existence and to know exactly what the text of the resolution required to be disclosed.  Moreover, if Stribling (or Luth, or Aubuchon) knew the effect of the resolution prior to the grand jury hearing in November 2008, and thus had reason to know that McCarroll was incorrect, then an ordinarily prudent person would not have believed probable cause existed to charge *Stapley* with disclosure violations.  A plain reading of the 1994 resolution shows that it rescinded prior resolutions and adopted nothing in their place.  The facts preclude summary judgment that probable cause existed.

### 2.    Statute of limitations

Irrespective of whether Luth or Stribling had probable cause to charge Stapley based on McCarroll's statement and a misreading of the 1994 resolution, Aubuchon attended the MACE meeting and presented the *Stapley I* draft indictment *before* the Stribling–McCarroll interactions.  Because McCarroll had not yet stated the 1994 resolution adopted the Arizona statutes regarding financial disclosures, her statement could not supply a factual basis for probable cause at that point—mere inconsistencies among Stapley's publicly recorded disclosures do not establish what he was required to disclose.

Moreover, when questioned by Stribling about whether the inconsistencies might reflect clerical error rather than knowing nondisclosure, Aubuchon stated that "if [the disclosure information is] not there then it's a crime."  Doc. 1112-9 at 18.  This also

suggests lack of probable cause to believe Stapley *knowingly* failed to disclose the relevant information.

Further, as noted above there is evidence Aubuchon instructed MACE deputies at the May 14 meeting to forward date their investigation, using May 14, 2008, rather than January 2007, as the date on which their work began. *See* Doc. 1112-3 at 87–88. This supports a finding that Aubuchon knew the statute of limitations on filing misdemeanor charges had run. Indeed, Luth testified that he understood that forward dating could have been an attempt to circumvent the statute of limitations. *See id.* at 9–10. This could lead a reasonable juror to conclude that even if Luth had probable cause to believe Stapley failed to disclose information, he knew or suspected that any resulting misdemeanor charges would be barred by the statute of limitations. This is consistent with Commissioner Passomonte's concerns at the *Stapley I* grand jury hearing, who declined to issue an arrest warrant in part because "[s]ome of th[e] charges, on their face, appear[ed] to be outside of the statute of limitations time." Doc. 1112-9 at 58, 64. Indeed, Aubuchon's negligence or knowledge as to the statute of limitations constituted partial grounds for her disbarment. *See In re Aubuchon*, 233 Ariz. 62, 309 P.3d 886, 892–93 (2013). To the extent Aubuchon, Luth, or other MACE deputies knew the claims were time barred, this supports a finding that there was no probable cause by the time Aubuchon presented the case to the grand jury. The evidence precludes summary judgment for Defendants.

### C.    Malice

Arpaio and Hendershott have not refuted an inference of malice—that they "initiate[d] or procure[d] the proceedings . . . primarily for a purpose other than that of bringing an offender to justice . . . ." Restatement (Second) of Torts § 653 (1977). A lack of probable cause may serve as evidence of improper purpose. *Id.* § 669. "The converse is not true. The fact that the defendant initiated or continued the prosecution or procured it for an improper purpose . . . is not in any way inconsistent with his reasonable

1   belief in the guilt of the accused and the existence of grounds reasonably justifying that

2   belief." *Id.* § 669A cmt. b.  Finally, "[w]hen there is evidence that [an ulterior] motive

3   played a substantial part in influencing his decision, the determination of whether the

4   ulterior purpose was the primary one is normally for the jury." *Id.* § 668.

5          Here, Stapley has testified that Arpaio and Hendershott both threatened to sue him

6   sometime prior to the spring of 2008 for making budget decisions adverse to MCSO and

7   that in the spring of 2008 Hendershott told Stapley that if the supervisor crossed a

8   metaphorical line in the sand regarding budget cuts, "I will get you.  We will get you."

9   Doc. 1112-5 at 20.  A reasonable jury could conclude that these coinciding threats were

10  made and reflect that Arpaio and Hendershott directed or approved the criminal

11  investigation that concluded with the *Stapley I* indictment for an improper purpose.

12  Arpaio and Hendershott therefore have not refuted the inference that they acted with

13  malice.

14

15         **D.    Favorable termination**

16         Arpaio and Hendershott are nonetheless entitled to summary judgment on

17  malicious prosecution of *Stapley I* if the case did not terminate in Stapley's favor.

18         Generally, a criminal proceeding terminates favorably by "final order in favor of

19  the accused by a trial or appellate court."   Restatement (Second) of Torts § 659(f).

20  "When a termination or dismissal indicates in some fashion that the accused is innocent

21  of wrongdoing it is a favorable termination.  However, if it is merely a procedural or

22  technical dismissal it is not favorable." *Frey v. Stoneman*, 150 Ariz. 106, 110, 722 P.2d

23  274, 278 (1986); *see also Jaffe v. Stone*, 18 Cal. 2d 146, 150, 114 P.2d 335, 338 (1941)

24  ("If, however, the dismissal is on technical grounds, for procedural reasons, or for any

25  other reason not inconsistent with his guilt, it does not constitute a favorable

26  termination.").

27         Here, *Stapley I* terminated by final order of the court of appeals in favor of

28  Stapley.  The *Stapley I* termination was inconsistent with guilt because one cannot be

guilty of a law that does not exist.  *See Stapley*, 227 Ariz. at 66, 251 P.3d at 1053. Irrespective of what McCarroll and Stapley believed Stapley was required to do by law, the fact is there was no properly adopted law requiring the disclosures.

### E.   Accrual of action

"A claim for malicious prosecution does not accrue until the prior proceedings have terminated in the accused's favor, including any pending appeal that could lead to further proceedings."  *Ekweani v. Maricopa Cnty. Sheriff's Office*, No. CV-08-01551-PHX-FJM, 2010 WL 2079773, at *6 (D. Ariz. May 24, 2010), *aff'd*, 471 F. App'x 583 (9th Cir. 2012).  *Cf. Amfac Distribution Corp. v. Miller*, 138 Ariz. 152, 154, 673 P.2d 792, 794 (1983) (concluding that the "damaging effect" of litigation is "not ascertainable until the appellate process is completed or is waived by a failure to appeal").

The Court of Appeals affirmed dismissal of the misdemeanor charges on March 24, 2011.  Stapley filed his suit on December 23, 2010.  His claim is not time barred by state law, which requires that "actions against any public entity or public employee shall be brought within one year after the cause of action accrues . . . ."  Ariz. Rev. Stat. Ann. § 12-821.

For the forgoing reasons, Arpaio and Thomas are not entitled to summary judgment as to Stapley's claim for malicious prosecution based on *Stapley I*.

## IV.   THE SEARCH

On February 25, 2009, MCSO Sergeant Jeff Gentry presented an application for a search warrant and supporting affidavit to Justice of the Peace Ore.  Judge Ore issued the search warrant for Stapley's office.  *See* Doc. 1067-2 at 8–12.  The accompanying affidavit set out the evidence uncovered by MCSO and MCAO allegedly suggesting that Stapley may have committed bribery, fraudulent schemes, and/or conspiracy to misuse public money.  *See* Doc. 1067-2 at 13–24.  The next day, MCSO executed the warrant. *See* Doc. 1072 at 7.

Stapley seeks summary judgment that Aubuchon violated the Fourth Amendment because she effected the warrant without probable cause. *See* Doc. 1065 at 5. Stapley asserts the warrant issued because of judicial deception. *See, e.g.*, Doc. 1065 at 5; Doc. 246 ¶¶ 307–08. Defendants seek summary judgment that the search was supported by probable cause, precluding liability, *see, e.g.*, Doc. 1072 at 6–7; Doc. 1062 at 13; Doc. 1066 at 12 n.7, that they are entitled to immunity, *see, e.g.*, Doc. 1066 at 13–15; Doc. 1063 at 11 n.8, or that they were otherwise uninvolved. Doc. 1063 at 10–11; Doc. 1139 at 4. Defendants' motions are addressed presently.

## A.    Legal standard

The Fourth Amendment prohibits search warrants that lack probable cause. U.S. Const. amend. IV ("no Warrants shall issue, but upon probable cause"). Probable cause for a search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). When evaluating an affidavit for probable cause, a judge may draw "reasonable inferences" from the materials offered. *United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006). A "fair probability" that evidence of a crime will be found suffices for probable cause, *Illinois v. Gates*, 462 U.S. 213, 238 (1983); "mere suspicion" of criminal activity does not. *United States v. Martinez*, 588 F.2d 1227, 1234 (9th Cir. 1978).

As a general matter, a determination of probable cause by a judge deserves a great deal of deference. *Gates*, 462 U.S. at 236. The deference, however, has limits. *United States v. Leon*, 468 U.S. 897, 914 (1984). To prevail in a § 1983 action asserting deception in an affidavit, a plaintiff must establish both (1) the defendant deliberately or recklessly made false statements in the affidavit and (2) the falsehoods or omissions were material to the finding of probable cause. *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004). Omissions or falsehoods are material if the judge could not have "issued the warrant in the absence of the contested statements." *Hervey v. Estes*, 65 F.3d 784, 789

(9th Cir. 1995).  Materiality is a matter for the court to determine.  *KRL*, 384 F.3d at 1117.  No good-faith exception preserves the reasonableness of a search when the affidavit underlying the warrant included information that the affiant knew was false or would have known was false, save for reckless disregard for the truth.  *Leon*, 468 U.S. at 923.

Finally, whether a particular set of facts constitutes probable cause is a question of law for the court.  *Cullison v. City of Peoria*, 120 Ariz. 165, 168, 584 P.2d 1156, 1159 (1978).  As such, absent a factual dispute, a court decides the question of probable cause. *Hansen v. Garcia*, 148 Ariz. 205, 207, 713 P.2d 1263, 1265 (Ct. App. 1986).  However, "if from one set of facts the conclusion can be inferred that probable cause exists, and from another that it does not, it is for the jury to determine the true state of facts." *Carroll v. Kalar*, 112 Ariz. 595, 598–99, 545 P.2d 411, 414–15 (1976).

Because Stapley asserts judicial deception, Defendants are not entitled to summary judgment if Stapley makes a "substantial showing" that they deliberately or recklessly disregarded the truth and establishes that the search would not have occurred but for the dishonesty.  *See Chism v. Washington*, 661 F.3d 380 (9th Cir. 2011).  Consequently, the Court must determine (1) whether the affidavit contained false statements, misrepresentations, or omissions, (2) whether those statements and omissions were material to the probable cause determination, and (3) whether Stapley has made a substantial showing of deliberate or reckless disregard for the truth.

### B.     Evidence supporting the search warrant

The affidavit signed and sworn to by Gentry declared that between 1995 and 2009, Stapley committed the crimes of bribery in violation of A.R.S § 13-2602(A), engaging in a fraudulent scheme in violation of A.R.S. § 13-2310(A), and/or conspiracy to commit misuse of public monies in violation of A.R.S. § 35-301.  *See* Doc. 1067-2 at 13–14.

To commit bribery, an individual must: (1) "confer[] or agree[] to confer any benefit upon a public servant or party officer," and (2) do so with the "intent to influence the public servant's . . . vote, opinion, judgment, exercise of discretion or other action in

his official capacity . . . ."   A.R.S.  §  13-2602(A)(1).   An individual is guilty of participating in a fraudulent scheme when, "pursuant to a scheme or artifice to defraud, [he] knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions . . . ."  *Id.* § 13-2310(A).  Finally, a "public officer or other person . . . charged with the receipt, safekeeping, transfer or disbursement of public money" commits misuse, inter alia, by appropriating it, without authority of law, "to his own use, or to the use of another."  *Id.* § 35-301.

The affidavit offered the following in support of probable cause: (1) evidence that Stapley misreported income "for the purpose of obtaining commercial loan funding"; (2) evidence of undocumented payments by Wolfswinkel-owned entities to Stapley, which "raise[d] suspicion regarding potential issues he may have voted or used influence to impact the transactions or decisions so that it may be construed as favorable to land and properties owned by Conley Wolfswinkel or related entities, in short—bribery or related crimes"; (3) evidence that Stapley or the Board may have misused public funds because Stapley's secretary, Susan Schuerman, used county-issued equipment to facilitate Stapley's personal business and because the Board may have "pay[ed] for criminal defense services for [Schuerman]" in violation of procurement laws.  *See* Doc. 1067-2 at 17–23.

### 1.   Evidence regarding fraud

The entirety of evidence of fraudulently obtained loans, as presented in the affidavit for the search warrant, was the following:

> [Stapley's] reported income for purposes of the U.S. Individual Tax Return is/was not consistent with reported income statements and records filed by, and on behalf of, Donald T. Stapley, Jr., and in his behalf as an owner of Arroyo Pacific Investments and / or Arroyo Pecans Partners, LLC, and Arroyo Pacific Partners, LLC for the purpose of obtaining commercial loan funding.
>
> An analysis of [Stapley's] personal and corporate account balances reveals an approximate reported personal worth of $8,061,246 according to a financial statement dated 5/10/2006; however, [Stapley's] U.S. Individual

income Tax Return documents filed on his behalf by his accountant . . . show significant difference between claimed personal worth and reported personal worth, specifically adjusted gross income shows -$49,577.00 in 2006.

*Id.* at 17.  Claims of high net worth and low net income are not, without more, evidence of a crime.  Many assets have more carrying expense than regular income.  Taxable income in any one year may not be proportional to asset value.

### 2.  Evidence regarding bribery

The crux of the evidence of bribery, as presented in the affidavit for the search warrant, was the following: Stapley's former bookkeeper, Joan Stoops, told detectives that Stapley had received monthly payments of $10,000 for a "partnership" he had with Conley Wolfswinkel having to do with land in Queen Creek, Arizona.  *See id.* at 18.  She initially told detectives that the payments were made in 2003 before erroneously stating, and then repeating, that they occurred in 2002.  *See* Doc. 1067-4 at 26, 29.  Stoops indicated that the payments were deposited into the Bank of America account of Stapley's company, Arroyo Pacific Investments, Inc.  The affidavit noted, however, that the funds could not be reconciled with the bank records but that the "existence of the funds may be found in additional accounts but these accounts are currently unknown to investigators."  *Id.* at 18.  Stoops further explained that she never saw any documentation relating to the Stapley-Wolfswinkel "partnership," and she was unable to identify how the $10,000 payments were reported on Stapley's 2002 individual tax return.  *See id.* at 18–19.  In addition, the affidavit explained that no documented partnership between Stapley and Wolfswinkel could be found in public records during the relevant period, and that Stapley never made the requisite disclosures as a member of the Maricopa County Board of Supervisors of the $10,000 payments or of any partnership.  *See id.* at 18.  The affidavit then suggested that this "raise[s] suspicion regarding potential issues [Stapley] may have voted or used [his] influence" as a county supervisor in a manner favorable to Conley Wolfswinkel.  *Id.* at 19.  It remarked that "further analysis of financial records is

still pending," and it listed known payments from Wolfswinkel-owned companies to Arroyo Pacific, none of which occurred in 2002. *Id.*

Additionally, it asserted that Maricopa County board minutes showed that Stapley voted on tax issues and other issues related to land, and that in "some of these minutes, Supervisor Stapley is noted voting on issues concerning land or nearby land that he would later own or be affiliated with himself or was or would be owned by a company described above." *Id.* at 20.  The only example of such a vote, however, is that in October 2002, Stapley signed the resolution "appointing Brandon Wolfswinkel to serve as trustee of the Spectrum Irrigation Water Delivery District No. 48 and approving the organization [of the District] that included parcels owned by Vanderbilt Farms, a [Wolfswinkel] company that he did not declare a conflict on until 2006 when he indicated that he had business dealings with the principals of Vanderbilt Farms." *Id.*

### 3.    Evidence regarding misuse of public funds

As set out in the affidavit, the evidence that someone[2] conspired to misuse public funds comprises two distinct issues:

(1) Stapley's secretary, Susan Schuerman, served as the Statutory Agent for Arroyo Pacific and listed her Board office telephone number as a contact number for Arroyo Pacific on the Arizona Corporation Commission website.  *See* Doc. 1067-2 at 20.  Moreover, investigators learned of a fax cover sheet with an official Board cover form that was sent from Stapley to a business associate regarding property "associated with Stapley's companies and the Wolfswinkels" and instructed the recipient to direct questions to Schuerman.  *See id.* at 22.  From this, investigators believed that Schuerman "is/has used county issued equipment including, but not limited to: telephones, fax machines, emails, computers, for use in personal business dealings in regards to that of [Stapley].  If these actions were committed, it is the belief of investigators that Susan

---

[2] As the quoted language below illustrates, the affidavit is particularly vague about *who* actually committed the criminal misuse of public funds.

1    Schuerman may have been compensated by [Stapley] in some other means or by way of a

2    financial compensation through her pay by the County of Maricopa." *Id.* at 21.

3        (2) Attorney Stephen Dichter emailed the MCAO and stated he would be

4    representing Schuerman, citing a contract with Maricopa County Materials Management,

5    and had consulted with her regarding interviews with MCSO detectives.   The affidavit

6    continues:

> Since any contract with Dichter's firm from the Maricopa County Materials
> Management would be limited to civil matters, Dichter, by his own
> acknowledgment is representing Schuerman in this criminal matter and
> may be doing so at taxpayer expense, which is a violation of procurement
> laws.
>
> [MCAO] sent a response to Dichter's email that they would not
> honor this representation, and that such actions would be in violation of the
> current Procurement Law.   In response to that, Dichter stated that if
> [MCAO] was unwilling to compensate him for his legal assistance that he
> would agree to represent [Schuerman] "Pro Bono."   Investigators believe
> that this order of events and communications show that . . . Schuerman had
> already sought legal council [sic] pertaining to these matters and that [the
> Board] would be in violation of procurement law with regard to the
> retention of Mr. Dichter for the criminal defense of Ms. Schuerman.
>
> In a letter to [MCAO] dated February 20, 2009[,] Mr. Dichter again
> stated that he is representing . . . Schuerman without regard to when or how
> he will be paid.  It is clear however that Schuerman will not be paying for
> her own defense.   Dichter stated in the first paragraph of this letter,
> ". . . although I had been asked to provide legal services to Susan
> Schuerman in connection with the Don Stapley case . . ." it remains unclear
> to investigators exactly who it is that asked Mr. Dichter for any type of
> representation in this criminal matter.  If in fact [the board] and/or Sandi
> Wilson in some way asked for this representation it would violate
> procurement law, but would also have to have been approved in an open
> meeting of the Board . . . .   Investigators have been unable to locate any
> public record of such an approval."
>
> . . . .
>
> Therefore, investigators believe that evidence of misuse of public monies
> by the use of public funds to retain and pay for criminal defense services
> for Susan Schuerman and theft will be found in the offices of [Stapley and
> Schuerman].

*Id.* at 21–22.

### C.        Misrepresentations and omissions in the supporting affidavit

Stapley argues the affidavit presented to Judge Ore in support of the search warrant contained a number of misrepresentations and omissions, given the relevant facts and circumstances that were known at the time the warrant was sought.  *See Ornelas*, 517 U.S. at 696.  Those misrepresentations and omissions created false impressions as to the nature and extent of the evidence suggestive of criminal activity by Stapley.

#### 1.        Misrepresentation and omissions of evidence of bribery
##### i.        Review of bank records

The proposed evidence of bribery hinged on Stoops's testimony that Stapley received payments from Wolfswinkel-owned companies in 2002, which could not otherwise be explained by legitimate business dealing between Stapley and the Wolfswinkels beginning in 2003.  Similarly, probable cause for the Wolfswinkel search also turned largely on Stoops's statements regarding payments from Wolfswinkel to Stapley's Bank of America account in 2002.  Thus, when MCSO sought the Wolfswinkel search warrant on January 21, 2009, the affidavit indicated that "[a]s of 01/20/2009, Investigators ha[d] not received all the documents requested by subpoena from Bank of America.  After speaking with Bank of America representatives, Investigators were informed that the anticipated time for these documents is between eight to ten days . . . ."  Doc. 1067-3 at 22.  MCSO sought Stapley's bank records to establish the bribery.

Over a month later, when MCSO sought the Stapley search warrant, a draft affidavit repeated that information from Bank of America was still unavailable: "As of 02/24/2009, investigators have not received all the documents requested by subpoena from Bank of America.   After speaking with Bank of America representatives, investigators were informed that the anticipated time for these documents is between eight to ten days . . . ."  Doc. 1112-17 at 5.  By the time the final affidavit was submitted, the following language took its place: "As of 02/24/2009, further analysis of financial records is still pending."  Doc. 1067-2 at 19.

1    This statement obscures the undisputed fact that by the time MCSO searched
2    Stapley's office it already had over 3500 pages of the records that Stoops indicated might
3    confirm the Wolfswinkel payments (and which of course did not). *See* Doc. 1067 ¶ 33.
4    Indeed, at oral argument, Hendershott conceded that he believed the "further analysis"
5    language reflected that the documents simply had not been reviewed. *See* Doc. 1167 at
6    45. The affidavit's representation that further analysis was pending, while not untrue,
7    obfuscated the fact MCSO had all the bank records it had requested and had not found
8    any support for Stoops's misstatement about payments in 2002.

9

10                       **ii.      Partnership documents**

11    As part of its discussion of the alleged "partnership" between Wolfswinkel and
12    Stapley, the affidavit stated that Stoops said she never saw any documentation relating to
13    the Queen Creek land deal or the Wolfswinkel–Stapley "partnership." Doc. 1067-2 at 18.
14    Stoops repeatedly clarified, however, that she added "[c]ommon paperwork" between the
15    two, such as "closing papers," to Stapley's files. Doc. 1067-4 at 28. Moreover, Stoops
16    clarified that she dropped off papers from Stapley at Wolfswinkel's office and that she
17    had picked up papers from Wolfswinkel for Stapley that she was "sure" was "paperwork
18    to the partnership." Doc. 779-1 at 90, 92. Thus, while the affidavit did not misquote
19    Stoops, it falsely implied that she believed—and that in fact—there was no
20    documentation about the "partnership" in question.

21

22                       **iii.     Public records of partnership**

23    Like the affidavit's note on partnership documentation, its assertion regarding
24    public documentation of the "partnership" was technically correct but misleading. The
25    affidavit indicated that investigators searching public records had found "no documented
26    partnership" between Stapley and Wolfswinkel during the relevant period. Doc. 1067-2
27    at 18. While this was true (albeit unsurprising, as investigators later learned that no
28    actual partnership existed), the affidavit neglected to mention that there were public

records documenting the relevant transactions between Stapley and Wolfswinkel.   In particular, an exclusive option agreement between Arroyo Pacific and Wolfswinkel entities regarding Queen Creek land, which was dated August 11, 2003, and which resulted in Wolfswinkel making monthly payments to Stapley's company, was on file with the Pinal County Recorder.  Doc. 1067 ¶ 24; Doc. 1067-5 at 4–14.  The affidavit's insinuation that no public record existed concerning Stapley's business dealings with the Wolfswinkels misrepresented the truth.

### iv.    Disclosure

According to the affidavit, neither the monthly $10,000 payments from the "partnership" with Wolfswinkel nor the "partnership" itself "were ever disclosed" on Stapley's Financial Disclosure Statements as required by his position on the Maricopa County Board of Supervisors.  Doc. 1067-2 at 18.  This lack of disclosure, according to the affidavit, raised "suspicion regarding potential issues he may have voted or used influence to impact the transactions or decisions so that it may be construed as favorable to land and properties owned by Conley Wolfswinkel or related entities . . . ."  *Id.* at 18–19.  But this was partly belied by the affidavit itself.  Two pages later, the affidavit states that in 2006, Stapley disclosed a conflict of interest arising out of business dealings with Wolfswinkel-company Vanderbilt Farms before a vote involving Vanderbilt Farms came before the Board of Supervisors.  *See id.* at 20; Doc. 1067-5 at 2.  He did so in a letter to the Clerk of the Maricopa County Board of Supervisors, citing the statutes requiring such disclosure.  *See id.*  Thus, the affidavit fairly suggested Stapley failed to disclose his business relationship with the Wolfswinkels before stating, somewhat obliquely, that he later formally declared a conflict because of that relationship.

### v.    Voting record

As evidence that Stapley had received bribes and as a result acted favorably to the Wolfswinkels in his position as supervisor, the affidavit offered the following:

> Investigators have learned from official Maricopa County board minutes that Donald Stapley voted on tax issues for land and other land related issues.  In some of these minutes, Supervisor Stapley is noted voting on issues concerning land or nearby land that he would later own or be affiliated with or was or would be owned by [one of other companies described in the affidavit].

Doc. 1067-2 at 19.

Gentry testified, however, that he never found any evidence supporting that Stapley had ever voted concerning land he or his friends owned.  *See* Doc. 1067-3 at 5, 10.   Instead, Gentry recalled "one or two [votes] where he recused himself because . . . the Board was going to vote on something that he was personally involved in . . . ."  *Id.* at 5.  This is consistent with the fact that Stapley disclosed his business dealings with Vanderbilt Farms in writing to Fran McCarroll and recused himself from a vote "to avoid any appearance of impropriety."  Doc. 1067-5 at 2.  Indeed, Aubuchon conceded that even after the search warrant she could not identify any votes implicating Wolfswinkel-owned land.  *See* Doc. 1067-4 at 20.

In fact, the only vote identified in the affidavit was from April 2002.  There, Stapley "voted to approve the district impact statement and authorize the persons proposing the district to circulate petitions" for the Spectrum Irrigation Water Irrigation District, to which the Board had earlier appointed Conley Wolfswinkel's son, Brandon, as trustee, and which comprised parcels owned by Vanderbilt Farms. Doc. 1067-2 at 20.

The affidavit suggests Stapley may have voted in favor of organization in exchange for the (nonexistent) 2002 payments.  Stapley has offered evidence, however, showing that the approval of Brandon Wolfswinkel was a ministerial and unanimous decision by the Board of Supervisors: Stapley characterizes the vote as "rote" because "the petition [to form the district] had been signed by all affected landowners, so the Board was statutorily-authorized [under A.R.S. § 48-3425] to enter an order immediately approving it."  Doc. 1065 at 9.  Indeed, Wolfswinkel's name did not even appear on the Board agenda when the organization was approved.  *See* Doc. 1167 at 87.  Defendants do not offer any evidence contradicting the ministerial nature of the water district vote.

1      Thus, at best the statement in the affidavit declaring that Stapley had voted on a

2   matter involving land he or his associates would one day own or with which they would

3   be affiliated is severely misleading.   As noted above, the affidavit also asserted that

4   Stapley "may have voted or used influence to impact the transactions or decisions so that

5   it may be construed as favorable to land and properties owned by Conley Wolfswinkel or

6   related entities . . . ."  Doc. 1067-2 at 19–20.  For the same reason, this assertion that

7   Stapley "may" have acted improperly misrepresented the truth; it was belied by the lack

8   of evidence at the time the affidavit was signed that Stapley had voted or used his

9   influence to benefit himself or the Wolfswinkels in any meaningful way.[3]

10

11              **2.      Misrepresentation and omissions of evidence of misused public
                         funds**

12       The second justification for alleging conspiracy to misuse public funds involved

13   Stephen Dichter providing counsel to Schuerman.  There is a dispute, however, as to

14   whether Aubuchon, Gentry, or both knew that Dichter would represent Schuerman pro

15   bono or otherwise had reason to know there was no crime when Gentry declared that

16   Dichter might have been representing her "at taxpayer expense, which is a violation of

17   procurement laws."  *Compare* Doc. 1067-2 at 21 *with* Doc. 1123 at 25.

18       On February 13, 2009, Andrew Thomas copied a letter to Dichter in which he

19   wrote that Dichter's representation was impermissible because "[r]etaining a criminal

20   defense attorney at county expense, to advise or represent a Maricopa County employee

21   suspected of criminal activity, is an unlawful expenditure of county funds."  Doc. 1067-6

22   at 2.   Thomas went on to note that "[g]overnment employees suspected of criminal

23   activity are required to retain counsel at their own expense.  They may not hire criminal

24   defense lawyers at county taxpayer expense."  *Id.* at 3.   Thomas did not articulate any

25

26   _____

27       [3] To the extent that the earlier vote appointing Brandon Wolfswinkel as trustee
     involved a distinct action from the otherwise ministerial task of organizing the district, it
28   does not support the conclusion that Stapley voted on issues involving Wolfswinkel-
     owned *land*.

particular procurement law or regulation.  The affidavit likewise refers only to "the current Procurement Law" and to "procurement laws" generally.  Doc. 1067-2 at 21.

But the county hired Dichter to represent Schuerman in December 2008 as an interviewee, before she became a suspect (or at least before the county, Dichter, or Schuerman believed she was a suspect).  Doc. 1067-5 at 72.  And both before and after Thomas's letter, Dichter wrote Aubuchon to inform her that he would represent Schuerman irrespective of whether he would ultimately be paid.  *Id.* at 72, 74.  The obvious inference is that nobody, let alone the Board or the county, had paid Dichter— and certainly not after Schuerman transformed from an interviewee to a suspect. Dichter's second letter to Aubuchon was dated two days before Gentry sought the search warrant.  Moreover, the affidavit plainly states that Dichter agreed to represent Schuerman if he was not compensated.  *See* Doc. 1067-2 at 21.  Thus, the assertion that Dichter *may* have been representing a criminal suspect at taxpayer expense was belied by the facts known to MCSO and MCAO and included in the affidavit—and it did not create probable cause to believe Stapley or the Board "*[k]nowingly* transfer[ed] . . . money when not authorized or directed by law," A.R.S. § 35-301(9), or otherwise misused or conspired to misuse public funds.

### D.     Materiality of misrepresentations and omissions

Without the misleading statements regarding Stapley's actions, the affidavit amounts to a discrepancy between Stapley's reported personal worth and his adjusted income in 2006, an insufficient proclamation by Stoops, refuted by unreviewed bank records in MCSO's possession, that Conley Wolfswinkel was making payments to Stapley's company in 2002, and two facts about Stapley's secretary: She listed her county office telephone number as a contact number for Arroyo Pacific on the Arizona Corporation Commission website, and she sent a fax three years before the search warrant regarding Stapley's non-county business and put her county phone number as a contact.  These two facts are trivial and simply would not lead "a man of reasonable

1   prudence [to believe] that contraband or evidence of a crime [would] be found" by

2   searching the office.  *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

3       All of the other purported "evidence" of criminal activity—Stoops's inability to

4   locate the payments on Stapley's tax records, the lack of public documentation of a

5   partnerships, and even the absence of $10,000 payments on Stapley's bank records—

6   were at least as exculpatory as they were inculpatory.  Defendants' theory of probable

7   cause for bribery hinged on the wild assumption that if no records of payments existed,

8   then the payments were made under the table.  They disregarded the more logical

9   inference: that no record of payments in 2002 meant no payments then but instead in

10  2003 as publicly documented and as Stoops first said.  For the information in an affidavit

11  to constitute probable cause, it must include reason to believe (1) that a crime was

12  committed, (2) that the individual identified in the affidavit committed the crime, and (3)

13  that evidence of the crime will be found in the place to be searched.  *Chism v.*

14  *Washington*, 661 F.3d 380, 389 (9th Cir. 2011).  Absent the misrepresentations regarding

15  Stapley's actions, the affidavit does not satisfy even the first prong of this triad.  As such,

16  the misstatements as to Stapley's conduct were material to the finding of probable cause.

17       Moreover, the misrepresentations shrouded the fact that the investigation was

18  less complete than it was made out to be.  Through its misleading statements, the

19  affidavit cloaked that investigators (1) had not reviewed the relevant bank statements,

20  which they had in their possession; (2) had not found the paperwork that Stoops believed

21  existed relating to the payments in question; and (3) had not located—or at least had not

22  revealed they had found—public records related to Stapley's business dealings with the

23  Wolfswinkels.  At least two of those sets of documents were publicly available, but in

24  early 2009, some six or seven years after the alleged crimes occurred, investigators

25  appeared to be in too much of a rush to look for them.  The misstatements covered holes

26  in the investigation that undermined any "fair probability" of a crime.  As such, they were

27  material to the question of probable cause.

28

1    "The false statements and omissions contained in [the] affidavit were material if

2    'the affidavit, once corrected and supplemented,' would not have provided a magistrate

3    judge with a substantial basis for finding probable cause." *Id.* at 389.  Here, even making

4    any reasonable inferences, *see Gourde*, 440 F.3d at 1071, the affidavit falls short of the

5    "fair probability" of a crime needed to establish probable cause.  As a general matter,

6    investigators have no duty to corroborate their evidence once they have established

7    probable cause.  *Id.* at 1073.  Similarly, they need not gather exculpatory evidence once

8    probable cause has been established.  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1147

9    (9th Cir. 2012).  However, they cannot stop looking at evidence before they have

10   probable cause for a search, which is what happened here.  A reasonable magistrate

11   would not have issued the warrant based on an accurate and complete representation of

12   the known evidence.  *See Chism*, 661 F.3d at 392.

13

14       **E.     Deliberate or reckless disregard for the truth**

15       To survive Defendants' motion for summary judgment, Stapley "need only make a

16   'substantial showing' of the [their] deliberate or reckless false statements and omissions.

17   'Clear proof of deliberation or recklessness is not required' at the summary judgment

18   stage.   If [he] make[s] such a substantial showing, then 'the question of intent or

19   recklessness is a factual determination' that must be made by the trier of fact."  *Chism*,

20   661 F.3d at 387–88 (alterations and internal citations omitted).  "Summary judgment is

21   improper where 'there is a genuine dispute as to the facts and circumstances within an

22   officer's knowledge or what the officer and claimant did or failed to do.'"  *Bravo v. City*

23   *of Santa Maria*, 665 F.3d 1076, 1087 (9th Cir. 2011) (quoting *Hopkins v. Bonvicino*, 573

24   F.3d 752, 763 (9th Cir. 2009)).

25

26

27

28

1                           **1.    Aubuchon**

2                           **i.    Involvement**

3         Aubuchon was the lead prosecutor for MACE and oversaw its day-to-day operations.

4 *See* Doc. 797-6 at 7. Although her general role was to provide legal advice and guidance,

5 Stapley has offered evidence that she in fact directed MACE investigations rather than

6 the MCSO case agents. *See* Doc. 1112-1 at 29. For example, one MCSO employee

7 described her role in MACE activities thus: "I realized [it] did not matter what detectives

8 said or what . . . sergeants, lieutenants, captains said, it mattered what Lisa Aubuchon

9 said." Doc. 1112-2 at 28. There is evidence that her role generally involved reviewing

10 applications for search warrants to ensure they were "accurate and defendable." Doc.

11 1112-1 at 42–43. And there is also disputed evidence that her role went further. For

12 example, Hendershott testified that Aubuchon made the ultimate call that MCSO had

13 sufficient probable cause to take the Wolfswinkel affidavit to court for a search warrant,

14 *see id.* at 54, and that her role in other MACE investigations was similar. *See id.* at 57.

15 *But see* Doc. 1108-2 at 3 (Hendershott testifying that Aubuchon did not have "any

16 authority to order any Sheriff's detective or deputy to do anything").

17         As noted above, Aubuchon began investigating Stapley in the spring of 2008. To

18 investigate "a lot of questionable things that were going on with his finances," *see* Doc.

19 797-3 at 56, Aubuchon may have recommended that MCSO interview Stoops. *See id.* at

20 89. She monitored the interview while it was being conducted and provided questions to

21 an MCSO interviewer during breaks. *See id.* at 90–91. Further, she was familiar enough

22 with the details of the case to know that Stoops's assertion that payments to Arroyo

23 Pacific began in 2002 was meaningful, *see* Doc. 1067-1 at 21, enough so that she

24 exclaimed "we got it"—apparently with reference to evidence of criminal activity—

25 immediately after the interview. *See* Doc. 797-5 at 46; *see also* Doc. 1112-2 at 31.

26 Aubuchon was also part of the collective decision to seek the earlier Wolfswinkel search

27 warrant, *see* Doc. 797-3 at 64–65, which sought evidence to support the same bribery

28 allegations.

With respect to the specific affidavit in support of the Stapley search, Aubuchon reviewed the draft penned by Gentry, helped prepare it, and made edits to it before it went to Judge Ore. *See* Doc. 1067-3 at 8, 11. Stapley offers Hendershott's testimony that Aubuchon concluded the search warrant affidavit was "good to proceed" or "good to go," but Hendershott appears to be referring to the Wolfswinkel search affidavit in this instance as well. Doc. 1112-1 at 49, 51. Nonetheless, Gentry testified that he copied many of the paragraphs in the Stapley affidavit directly from the Wolfswinkel affidavit. *See* Doc. 1112-2 at 98–99. Aubuchon testified that the final decision to get the search warrant fell to MCSO, *see* Doc. 1108-1 at 10, and Gentry testified that he took it to Judge Ore after his direct superior, Lieutenant Tucker, approved it. *See* Doc. 1067-3 at 15.

### ii.    Evidence

There is evidence that further investigation either by Stoops or by MCSO could have cleared up whether the payments were in 2002 or 2003. Stoops indicated in her January 21, 2009 interview,[4] which Aubuchon watched, that she believed she could determine when Stapley received Wolfswinkel payments by reviewing her "yellow papers" and checking the computer she had used while employed by Stapley. *See* Doc. 1067-4 at 27, 30, 36. She informed her interviewers that she did not "know what has happened to the computers that were in the office. If you had those, you'd, you'd have it all." *Id.* at 30. Neither Aubuchon nor MCSO followed up with respect to either Stoops's papers or the office computer to which she referred. *See* Doc. 1067-1 at 23, 28, 33–34.

Although neither the computer nor the "yellow papers" were in Stoops's possession when she was interviewed, "[m]aybe a week to two weeks" after the interview she reviewed her work papers and confirmed that there were no payments in 2002. Doc. 1108-14 at 22; Doc. 1067-2 at 29. This shows that slight further investigation would have quickly corrected Stoops's incorrect recollection about when the payments were received. Nonetheless, nobody conducted further investigation in light of Stoops's

---

[4] The interview may have been on January 12, 2009. *See* Doc. 1108-14 at 22.

1    statements—notwithstanding testimony from an MCSO officer who interviewed Stoops

2    that she was "old" and "seemed confused."  Doc. 1112-2 at 32.

3          Moreover, there is evidence that Aubuchon had reason to know there were no

4    payments in 2002 even without following up Stoops's statements.  On February 25, 2009,

5    the same day Gentry applied for the search warrant and the day before it was executed,

6    the Wolfswinkels filed a motion to controvert the earlier search warrant executed against

7    them.  *See* Doc. 1067 ¶ 10.  In support of their motion, the Wolfswinkels submitted

8    affidavits from Stoops and Kathleen Holderbach, the Wolfswinkels' business controller.

9    Both testified that the Wolfswinkels had not made any payments to Stapley in 2002.  *See*

10   *id.* ¶¶ 10, 12.  Although the Stoops affidavit was dated March 4, 2013, Aubuchon again

11   did not dispute Stapley's assertion that it in fact supported the February 25, 2009 motion

12   to controvert.  *Compare id.* ¶ 10 *with* Doc. 1108 ¶ 10.  Holderbach's affidavit was dated

13   February 25, 2009.

14         The fair inference is that Aubuchon may have learned that Stoops's initial

15   assertion regarding 2003, rather than 2002, was in fact correct before MCSO executed the

16   search.  *See* Doc 1067-4 at 43–44 (reflecting that Aubuchon learned the details of the

17   motion to controvert at an unidentified time after it was filed).  Aubuchon does not deny

18   that she had the motion but argues only that "[t]here is no showing that information [in

19   the motion to controvert] was available to Aubuchon or detectives prior to the Stapley

20   search warrant."  Doc. 1108 ¶ 10; *see also* Doc. 1112-2 at 104–05 (Gentry stating he did

21   not know about Wolfswinkel's motion to controvert when he applied for the Stapley

22   search warrant).

23         Further, Aubuchon's testimony as to whether she was aware that Gentry's research

24   had not located any vote by Stapley involving the Wolfswinkels' land—the *quo* to the

25   nonexistent 2002 payments' *quid*—is unclear.  She may have been aware that Gentry's

26   research had not yet produced any results before the affidavit was taken to Judge Ore.

27   *See* Doc. 1067-4 at 20; Doc. 1067-3 at 5.

28

1   There is also evidence that Aubuchon told investigators to lie regarding the
2   Stapley affidavit or at least knew it contained "creative writing."  In a meeting regarding
3   a search warrant, Aubuchon told then-Lieutenant Rich Burden to "put a little fluff above,
4   fluff below, use a little creative writing, any judge will sign that."  Doc. 1112-9 at 107.
5   Burden testified that Aubuchon's words and mannerisms led him to believe she wanted
6   him to be "possibly dishonest."  *Id.* at 115.  Burden testified that Aubuchon made the
7   fluff remarks to him in a meeting about a search warrant, which was to be based in part
8   on some news article that "had something to do with bug sweeping."  *Id.* at 101, 106.
9   Burden has similarly described this meeting as regarding a search warrant for "[t]he
10  Board of Supervisors Office, due to some bug sweep and funds used, county funds used."
11  Doc. 1112-9 at 120.

12   Luth similarly testified about a meeting attended by Burden and Aubuchon in
13  which Aubuchon made comments about creative writing with respect to a search warrant.
14  *See* Doc. 1112-3 at 19.  Luth testified, however, that Burden seemed to be referring to a
15  warrant he had in his hand and on which he had made markings to reflect things "he
16  didn't like."  *Id.* at 20.  In fact, the item in Burden's hand was a copy of Gentry's
17  affidavit in support of the Stapley search warrant.  *See id.* at 20–21; Doc. 1112-17 at 2.

18   Other evidence suggests that although the "creative writing" comments were made
19  regarding an affidavit that post-dated the Stapley search, Aubuchon instructed that the
20  Stapley search warrant application should be used as a model—presumably of such
21  creative writing.  *See* Doc. 1112-16 at 64.  Thus, there is evidence that Aubuchon
22  suggested MCSO deputies add "fluff" and "creative writing" to the affidavit in support of
23  the Stapley search warrant or a different warrant—and even if it was a different affidavit,
24  that her statements impliedly conceded that such "creative writing" infected the Stapley
25  affidavit.

26   Defendant Aubuchon, then, both had knowledge of details associated with the
27  investigation and was involved in editing and finalizing the affidavit for the search
28  warrant.  Her involvement went significantly beyond simply advising officers that a

1    search warrant would be necessary to gather more evidence or providing general legal

2    advice.  *See Butler v. Elle*, 281 F.3d 1014, 1022 (9th Cir. 2002).  Further, Stapley has

3    offered disputed evidence that she knew the Stapley affidavit included "creative writing"

4    to misrepresent probable cause.  He has made a "substantial showing of deliberate

5    falsehood or reckless disregard for the truth," *id.* at 1024; a reasonable jury could

6    conclude that the material misstatements in the affidavit followed from her reckless

7    disregard for the truth or from her intentional deceit.  Accordingly, Aubuchon is not

8    entitled to summary judgment on the issue of whether she is liable for judicial deception.

9

10                    **2.      Thomas**

11        Thomas was the Maricopa County Attorney and partnered with Arpaio to form

12   MACE.  As a general matter, Thomas attended MACE meetings, *see* Doc. 1112-1 at 40,

13   oversaw Defendant Aubuchon's work on MACE cases, and provided advice as to how

14   cases should be handled.  *See* Doc. 1112-13 at 133–34.  Aubuchon testified that she kept

15   Thomas informed about all MACE matters through "an ongoing dialogue" and that "all

16   of [her] actions" were taken with his "full knowledge and consent."  *Id.* at 133–35, 137.

17        However, there is no material dispute as to Thomas' involvement with the details

18   of the Gentry affidavit or the search warrant.  Stapley has offered no evidence that

19   Thomas was aware of the moving parts of the bribery investigation, including the

20   research into Stapley's record and the review of Arroyo Pacific's bank records.  Stapley

21   has offered evidence that Thomas knew of and took an active role in investigating

22   whether Schuerman and Stapley were misusing county money.  *See* Doc. 1067-6 at 2–3.

23   But there is no evidence that he contributed to or had knowledge of how that information

24   was framed and described in the affidavit—or even that it would be included.  Gentry

25   similarly testified that Thomas did not give him any input on MACE investigations.  *See*

26   Doc. 1064-1 at 25.  Finally, there is no evidence that he participated in the search itself.

27        Stapley has not offered evidence that Thomas knew of the affidavit's flaws.  As

28   such, Stapley has not made a "substantial showing" that his limited involvement in the

1   affidavit and search reflect reckless disregard for the truth or intentional dishonesty that

2   contributed to the material misrepresentations in the affidavit.  Thomas is entitled to

3   summary judgment on the issue of judicial deception in obtaining the warrant.

4

5           **3.      Hendershott**

6           Hendershott was second in command at MCSO; he ran the department at the

7   direction of Arpaio and reported directly to him.  Doc. 797-2 at 4.  Hendershott's duties

8   included directly supervising the operations of the MACE unit targeting public

9   corruption.  *Id.* at 8–10.  Arpaio explained that Hendershott was "the ultimate supervisor"

10  of MACE investigations.  *See* Doc. 797-1 at 11.  When asked if he was intimately

11  involved in the MACE cases," he testified that it was "absolutely" fair to say that he was;

12  he further deemed it a "semi-fair characterization" to say that he "essentially controlled

13  the MACE investigations."  Doc. 1112-1 at 41.  Hendershott elaborated: "If there was

14  something going on in MACE that would be a major movement in any case, . . . I tried

15  my very best to understand completely what was going on . . . ."  *Id.*  By his own

16  admission, he "watched the MACE operations like a hawk," *id.* at 41–42, and had an

17  "extremely active role" in them.  *Id.* at 42.  Hendershott explained that the need for his

18  heavy involvement in MACE cases stemmed in part from the fact that he had to keep

19  Arpaio up-to-date on investigations.  He briefed Arpaio almost daily on MACE

20  investigations; keeping him well informed was particularly important in high-profile

21  cases that would likely attract media attention.  *Id.* at 31, 36.

22          There is also evidence that Hendershott was intimately involved in MACE's

23  investigation into Stapley, specifically.  Hendershott watched the Stoops interview,  *see*

24  Doc. 1073-3 at 5, and afterwards it became clear to MCSO employees that the Stapley

25  investigation was "top down," with Hendershott and Aubuchon directing it, Doc. 1112-2

26  at 37; *see also id.* at 34, and telling deputies whether probable cause existed for certain

27  actions.  *See id.* at 58.  Hendershott and Aubuchon, rather than the detectives, became the

28  "case agents."  Doc. 1067-1 at 30–31.  And indeed, beginning at least in January or

February of 2009—corresponding with the Stoops interview and the subsequent *Stapley II* investigation—Hendershott (along with Aubuchon) was making investigative decisions "in direct contradiction to detectives' desires and investigative experience" and that "detectives' opinions . . . were not being considered by Lisa Aubuchon and by Chief Hendershott."  Doc. 1112-17 at 110–11.  Perhaps most troubling given Hendershott's direct decisionmaking, MCSO Detective Jonathan Halverson testified that he "chose to ignore certain facts that were in front of him."  *Id.* at 111.

Whether Hendershott was involved in securing the search warrant is more a matter of inference.  Although Hendershott testified that he knew every time MACE executed a search warrant, he did not draft, review, or approve individual affidavits.  *See* Doc. 1067-6 at 16–17.  Indeed, sometimes he would simply rely on Aubuchon's approval of affidavits.  *See* Doc. 1112-1 at 51.  Hendershott did not ask Gentry to write the Stapley search warrant or affidavit.  *See* Doc. 1112-2 at 90.  Nor did Hendershott give Gentry final direction to take the warrant application to Judge Ore or anyone else—he took it to Judge Ore after his direct superior, Lieutenant Tucker, approved it.  *See* Doc. 1067-3 at 15.  Tucker testified, however, that the Wolfswinkel and Stapley search warrant applications went to Hendershott before they were submitted, *see* Doc. 1112-16 at 104, and that Hendershott specifically ordered that they be taken to Judge Ore rather than to a superior court judge.  *Id.*  There is no evidence that Hendershott was involved in executing the Stapley search beyond general assertions that "there was nothing that went on [in MACE] that [Hendershott] didn't direct."  Doc. 1112-2 at 3.

There is, however, ample evidence that Aubuchon and Hendershott essentially acted "as one."  Doc. 1112-17 at 110.  Hendershott and Aubuchon communicated very frequently—sometimes daily.  *See* Doc. 1112-1 at 47–48.  They had a "very tight working relationship."  *Id.* at 169.  Indeed, MCSO subordinates testified that Hendershott and Aubuchon were "really one and the same," *id.* at 171, and being "in essence one being, one mind."  Doc. 1112-17 at 105.  One officer testified that if Aubuchon wanted something done, she would tell Hendershott and he would order it.  Doc. 1112-1 at 169;

*see also* Doc. 1112-2 at 28.  On the other hand, Luth noted that their directions didn't "always match[] up," Doc. 1112-3 at 36, and Aubuchon testified that sometimes she and Hendershott disagreed with each other.  *See* Doc. 1112-4 at 23.

Stapley has offered evidence that Hendershott was intimately involved in MACE activities generally and the Stapley investigation specifically.  Moreover, there is substantial evidence that Hendershott and Aubuchon largely functioned as a unit, and it is a fair inference that Hendershott's knowledge paralleled Aubuchon's.  On balance, Stapley has made a substantial showing that Hendershott recklessly disregarded the truth with respect to MCSO's decision to seek a search warrant.

### 4.      Arpaio

The extent of Sheriff Arpaio's involvement with the MACE unit is disputed. There is inconsistent evidence that Arpaio attended regular MACE meetings, *compare* Doc. 1112-1 at 36–37 (Hendershott testifying that Arpaio attended two-thirds of MACE meetings) *with* Doc. 1112-3 at 22 (Luth testifying that Arpaio attended fewer). Nonetheless, Arpaio generally suggested how MACE should operate.  *See* Doc. 1112-1 at 37.  Moreover, Hendershott had "almost daily" meetings with Arpaio, *id.* at 31, and "[a]bsolutely" briefed Arpaio "regularly" on MACE activities.  *Id.* at 36.  Hendershott kept Arpaio informed in particular of "activity against a high-profile person, someone that would generate potential media," *id.*, and that Hendershott briefed Arpaio before executing search warrants of high-profile targets.  *See id.* at 48.

Aubuchon also played a role in keeping Arpaio in the loop.  Hendershott testified that Aubuchon would brief Arpaio "on the nuts and bolts" of cases.  *Id.*  Aubuchon likewise testified that she attended fifteen to twenty meetings in which she and Hendershott discussed the Stapley investigations and prosecutions with Arpaio.  *See* Doc. 1112-4 at 39.

Nonetheless, there is no direct evidence that Arpaio knew of the details in the Stapley search warrant application.  Hendershott testified that he did not inform Arpaio of

- 34 -

1   day-to-day activity and that neither he nor Arpaio needed to read or approve warrants.

2   *See* Doc. 1112-1 at 46.  This is consistent with Gentry's testimony that Arpaio did not

3   make any comments to him regarding the search warrant affidavit.  *See* Doc. 1067-3 at 13.

4          In the end, the evidence that Arpaio intentional or recklessly disregarded the truth

5   with respect to MCSO's decision to seek the search warrant is that he was regularly

6   briefed by Hendershott and Aubuchon and had a particular interest in high-profile cases

7   like this.  It is a closer question whether the evidence has the force of a "substantial

8   showing."  The persuasiveness and inferential force of that evidence must be left to the

9   jury, which could reasonably conclude that Aubuchon and Hendershott shared with

10  Arpaio everything they knew about the details and defects in the search warrant.  Arpaio

11  is not entitled to summary judgment as to the issue of judicial deception and liability for

12  the search.

13

14        **F.      Qualified immunity**

15              **1.      Legal standard**

16        "Qualified immunity shields federal and state officials from money damages

17  unless a plaintiff pleads facts showing (1) that the official violated a statutory or

18  constitutional right, and (2) that the right was 'clearly established' at the time of the

19  challenged conduct."  *Ashcroft v. al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2080 (2011).

20  Courts may address either prong first and may grant qualified immunity based on the

21  second prong alone without deciding the first prong.  *Pearson v. Callahan*, 555 U.S. 223,

22  236 (2009); *James v. Rowlands*, 606 F.3d 646, 650–51 (9th Cir. 2010).

23        "A [g]overnment official's conduct violates clearly established law when, at the

24  time of the challenged conduct, the contours of a right are sufficiently clear that every

25  reasonable official would have understood that what he is doing violates that right."  *al-*

26  *Kidd*, 131 S. Ct. at 2083 (internal quotation and alteration marks omitted).  For a right to

27  be "clearly established," there need not be case law "directly on point, but existing

28  precedent must have placed the statutory or constitutional question beyond debate."  *Id.*

"The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244.

To get qualified immunity, the officer must "reasonably believe in good faith that [his] actions are constitutional." *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981); *see also Pierson v. Ray*, 386 U.S. 547, 557 (1967). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" and offers "ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

### 2. Application to the search

Once a plaintiff has made out a claim for judicial deception against particular defendants, summary judgment in their favor on qualified immunity grounds is inappropriate. This is because it is clearly established that plaintiffs have "a constitutional right to not be searched . . . as a result of judicial deception." *Chism v. Washington*, 661 F.3d 380, 393 (9th Cir. 2011). For the reasons elucidated above, Aubuchon and Hendershott are not entitled to qualified immunity with respect to the search; Thomas and Arpaio are.

## V. THE ARREST AND *STAPLEY II* INDICTMENT

In August 2009, eight months after the *Stapley I* indictment and sixth months after the search of Stapley's office, Superior Court Judge Kenneth Fields dismissed a number of the misdemeanor charges that formed the basis of *Stapley I*. On Friday, September 18, 2009, Yavapai County Attorney Sheila Polk—to whom the Stapley prosecution had been conflicted out—voluntarily dismissed the remaining charges to appeal Judge Fields's order and informed Arpaio and Hendershott of her decision by phone. *See* Doc. 1112-10 at 14–15. She also specifically told Arpaio and Hendershott that she had directed MCSO to probe further the actions motivating the *Stapley II* investigation and that the *Stapley II* case was not ready to go forward.

1    Nonetheless, MCSO arrested Stapley without a warrant on Monday, September

2    21—the very next business day.  *See* Doc. 1112 ¶¶ 196–203.  The charges included

3    fraudulent schemes and artifices, perjury, theft, and other prohibited acts, *see* Doc. 1072

4    at 7, and were based on allegations Stapley committed mortgage and loan fraud,

5    campaign account fraud with respect to his 2004 and 2008 bids for county supervisor,

6    campaign account fraud with respect to his campaign for the executive committee of the

7    National Association of Counties (NACo), and theft also with respect to his NACo

8    campaign.  *See* Doc 1073-3 at 45–53.  Nobody showed up to prosecute the case within

9    forty-eight hours, *see* Doc. 1112-4 at 43, so the charges were dismissed.  Stapley's fourth

10   cause of action states a claim against Arpaio, Aubuchon, and Hendershott for false arrest.

11   Less than three months after he was arrested, Stapley was indicted again—this

12   time largely for the crimes underlying his arrest: fraudulent schemes and artifices,

13   perjury, forgery, false swearing, and theft.  These charges all arose from Stapley's alleged

14   mortgage fraud (one count) and misuse and misreporting regarding campaign funds

15   raised to support his election to the Board and to the NACo executive committee (twenty

16   six counts).

17   As a result of the arrest, Stapley seeks summary judgment that Arpaio ordered a

18   retaliatory arrest in violation of § 1983 (irrespective of whether probable cause existed to

19   support the arrest), *see* Doc. 1060 at 1–2, while Arpaio and Hendershott seek summary

20   judgment that probable cause supported the arrest and thus that it was valid.  *See* Doc.

21   1072 at 1–3, 7–8; Doc. 1062 at 10–11.  Aubuchon seeks summary judgment that she was

22   insufficiently involved in the arrest to be liable.  *See* Doc. 1066 at 3.

23   As a result of the *Stapley II* indictment, Stapley seeks damages for malicious

24   prosecution—his sixth claim for relief.  As noted above, Stapley no longer asserts

25   malicious prosecution counts against Thomas and Aubuchon, and only Arpaio and

26   Hendershott remain as defendants with respect to the malicious prosecution claims.  Each

27   moves for summary judgment.  Because the same actions formed the bases of the arrest

28

1   and the subsequent indictment, they are analyzed together here.   The Court considers

2   Defendants' motions and draws inferences in Stapley's favor.

3

4       **A.**    **Legal standard**

5       To prove false arrest, a plaintiff must demonstrate detention "without his consent

6   and without lawful authority."  *Reams v. City of Tucson*, 145 Ariz. 340, 343, 701 P.2d

7   598, 601 (Ct. App. 1985)).   "'The essential element necessary to constitute either false

8   arrest or imprisonment is unlawful detention.'   A detention that occurs pursuant to legal

9   authority, such as an arrest based on probable cause, 'is not an unlawful detention.'"  *Al-*

10  *Asadi v. City of Phoenix*, No. CV-09-47-PHX-DGC, 2010 WL 3419728, at *3 (D. Ariz.

11  Aug. 27, 2010) (quoting *Slade v. City of Phoenix*, 112 Ariz. 298, 300, 541 P.2d 550, 552

12  (1975)).   "A plaintiff establishes a prima facie case by showing that he was arrested by

13  the defendant without a warrant, and the burden then devolves upon the defendant to

14  establish that the arrest was founded upon probable cause."  *Reams*, 145 Ariz. at 343, 701

15  P.2d at 601.  Generally, "probable cause to believe that a person has committed any crime

16  will preclude a false arrest claim, even if the person was arrested on additional or

17  different charges for which there was no probable cause."  *Ewing v. City of Stockton*, 588

18  F.3d 1218, 1230 n.19 (9th Cir. 2009) (quoting *Holmes v. Vill. Of Hoffman Estate*, 511

19  F.3d 673, 682 (7th Cir. 2007)).   To establish false arrest against Aubuchon, a prosecutor,

20  Stapley must demonstrate that she "ordered or otherwise procured the arrest," in addition to

21  proving a lack of probable cause.  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir.

22  2012) (en banc).

23      As discussed above, malicious prosecution requires a criminal proceeding that

24  lacked probable cause and terminated in Stapley's favor, and which was motivated by

25  malice or a primary purpose other than bringing him to justice.  *See* Restatement

26  (Second) of Torts § 653 (1977).

27

28

1

   **B.      Probable cause**

2      In support of their argument that probable cause supported the arrest—and thus

3   that Stapley's false arrest claim must fail—Arpaio and Hendershott assert that ample

4   evidence supporting probable cause is contained in the Probable Cause Addendum to the

5   Arrest Submittal Form.  In support of their argument that probable cause supported the

6   *Stapley II* indictment—and thus that this particular claim for malicious prosecution must

7   fail—Arpaio and Hendershott assert that ample evidence is contained in the Charging

8   Summary.  Defendants' anemic analysis and invitation for this Court to proceed largely

9   unguided through the Addendum and Charging Summary is insufficient for summary

10  judgment—especially with respect to the warrantless arrest.  Nonetheless, a close

11  analysis of the evidence also precludes summary judgment for Defendants.

12     MCSO deputies attached the Probable Cause Addendum to the Arrest Submittal

13  Form, which was dated the same day as the Stapley arrest: September 21, 2009.  *See* Doc.

14  1073-3 at 38.  The Addendum includes nearly nine pages of information purporting to

15  show Stapley violated A.R.S. 13-2310.A (fraudulent schemes and artifices), A.R.S. § 13-

16  2702.A.2 (perjury), A.R.S. § 13-1802.A.3 (theft), and A.R.S. § 38-504C (prohibited acts).

17  The Charging Summary, which was dated September 9, 2009, appears to contain

18  information compiled by MCSO officers that was eventually used to craft the Probable

19  Cause Addendum.  *See* Doc. 1073-3 at 55–86.

20     The fraudulent schemes and perjury charges described in the Probable Cause

21  Addendum were premised largely on campaign reporting violations related to Stapley's

22  campaigns for the Board of Supervisors.  The subsequent *Stapley II* indictment included

23  the perjury charges, and it also repackaged the perjury and these fraudulent schemes

24  charges as false swearing charges.  The fraudulent schemes charges were also partly

25  premised on mortgage fraud and tax fraud, but there was no probable cause to support

26  those theories.  The arresting officer testified that the evidence was "overwhelming and

27  blatant" that there was no mortgage fraud, *see* Doc. 1112-2 at 48; and the tax fraud

28  charges were based on Stapley's alleged failure to report option and loan payments that

1   MCSO knew were not required to be reported by law.  *See* Doc. 1073-3 at 47; Doc. 1112-

2   11 at 109; *see generally Hardee v. United States*, 708 F.2d 661 (Fed. Cir. 1983).  The

3   subsequent *Stapley II* indictment included the mortgage fraud charges.  It did not include

4   the tax fraud charges.  *See* Doc. 1112-13 at 32–45.

5         The theft, prohibited acts, and some of the fraud charges described in the

6   Addendum were premised on Stapley's personal use of gifts to his NACo campaign.  But

7   it is also clear that the prohibited acts and theft charges lacked probable cause.  They

8   were premised on the theory that it was illegal for Stapley to use the NACo contributions

9   for personal purchases—but it was not.  Stapley's campaign for NACo, a private,

10  nonprofit organization, was not governed by any election law.  More importantly, there is

11  evidence that MCSO significantly mischaracterized the witness interviews that formed

12  the basis of the NACo-related charges.  *See* Doc. 1112-16 at 46–47; Doc. 1123 at 35.  In

13  fact, although these charges were premised on the idea that Stapley misused donor

14  contributions, no donor had authority to restrict Stapley's use of the money, and none had

15  attempted to do so.  No donor had ever "expressed unhappiness as to how the funds had

16  been used," *see* Doc. 1112-10 at 51, and none served as a complainant leading to the

17  arrest.  *See Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004) ("Probable

18  cause cannot be established by an erroneous understanding of the law.").  The subsequent

19  *Stapley II* indictment was based largely on the theft theory (theft comprised eighteen of

20  the twenty-seven charges).  It did not include charges for prohibited acts.  Thus, the only

21  charges that merit further attention are the fraudulent schemes and artifices allegation

22  based on reporting violations and on the perjury and false swearing allegations.

23

24                    **1.    Fraudulent schemes and artifices (arrest)**

25         MCSO asserted in the Addendum that Stapley committed fraudulent schemes and

26  artifices "by knowingly using campaign funds for personal gain by filing false campaign

27  finance reports" related to his 2004 and 2008 elections to the Board, by transferring

28  money between his Board campaign accounts and his NACo account, and by failing to

1   report a transfer between his a Board campaign account and an Arroyo Pacific account.

2   Doc. 1073-3 at 46.

3          Arizona criminalizes fraudulent schemes and artifices and provides the following:

4   "Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any

5   benefit by means of false or fraudulent pretenses, representations, promises or material

6   omissions is guilty of a class 2 felony."  A.R.S. § 13-2310.

7          Here, the Probable Cause Addendum states that (1) Stapley routed money from his

8   2004 Board campaign account ("Stapley for Supervisor"), through his NACo account,

9   and ultimately to a different Board campaign account ("Stapley 08")—and that in doing

10  so he retained over $600 in Board campaign money in the NACo account; (2) he failed to

11  report a seven-day loan of $8000 from a campaign account to a personal account; (3) he

12  transferred $2117.34 from the Stapley 08 account to an Arroyo Pacific account without

13  reporting it; and (4) he reported paying $1500 in rent to Arroyo Pacific, but the

14  disbursement went to an address other than Arroyo Pacific's address of record and bank

15  records did not reflect such a disbursement.  *See* Doc. 1073-3 at 46.

16         The Charging Summary adds only two relevant sentences—and it is with respect

17  to the money routed from the 2004, through the NACo account, and ultimately to the

18  2008 account: "It appears that [Stapley] 'washed' these funds through this account

19  because he could not reconcile his bank balance to his 2004 campaign finance reports.

20  The effect of this series of transactions was to leave $644 donated by citizens or Political

21  action committees to his Board of Supervisors 2004 political campaign in an account

22  where expenditure reporting is not required."  Doc. 1073-3 at 74–75.

23         This is not "information sufficient to lead a person of reasonable caution to believe

24  that an offense has been or is being committed by the person being arrested."  *United*

25  *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  It is improbable that an elected

26  official of considerable means would intentionally move money between accounts in an

27  attempt to defraud campaign donors of $2800.  The more likely explanation is simple

28  oversight.  Later investigation suggested Stapley made a payment from his Arroyo

Pacific account to a Bank of America Business credit card on the exact same day as the $2117.34 transfer and in the exact same amount.  But that conclusion came twenty months *after* the Addendum and Charging Summaries were prepared, and neither contained this fact.

"[W]hen specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred."  *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994).  MCSO did not present in the Addendum or the Charging Summary evidence rising above "mere suspicion, common rumor, or even strong reason to suspect" that Stapley had knowingly obtained a benefit by means of false or fraudulent pretenses.  *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).  There was not a "fair probability" of such a crime. *Lopez*, 482 F.3d at 1072.  It is perhaps unsurprising both that the Charging Summary did *not* recommend fraudulent schemes charges based on these transfers and that the subsequent indictment did *not* present these transfers as evidence of fraudulent schemes or artifices.

## 2.     Perjury (arrest and indictment)

Based on the same unreported (or misreported) transfers, MCSO also asserted in the Probable Cause Addendum that Stapley committed perjury in violation of A.R.S. 13-2702(A)(2) by knowingly filing false campaign finance reports: (1) He filed two reports stating money had been transferred directly from the Stapley for Supervisor account to the Stapley 08 account when in fact it had been routed through his NACo account; (2) he failed to report a transfer of $2000 from the Stapley to Supervisor account to Arroyo Pacific; and (3) he failed to report that $8000 was transferred from the Stapley 08 to his personal account and then back again seven days later.  *See* Doc. 1073-3 at 46.  The *Stapley II* indictment included these perjury charges.  *See* Doc. 1112-13 at 34–35.

In Arizona, "[a] person commits perjury by making either[] (1) [a] false sworn statement in regard to a material issue, believing it to be false," or "(2) [a] false unsworn

declaration, certificate, verification or statement in regard to a material issue that the person subscribes as true under penalty of perjury, believing it to be false." A.R.S. § 13-2702(A). "Materiality is a necessary element of the offense of perjury." *State v. Fodor*, 179 Ariz. 442, 453, 880 P.2d 662, 673 (Ct. App. 1994). "'Material' means that which could have affected the course or outcome of any proceeding or transaction." A.R.S. § 13-2701. Generally, this refers to affecting the decision of a tribunal. *See United States v. McKenna*, 327 F.3d 830, 839 (9th Cir. 2003) ("A statement is material if 'it has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed.'") (quoting *United States v. Leon–Reyes*, 177 F.3d 816, 820 (9th Cir.1999)).

Here, MCSO suspected that Stapley lied in his campaign finance reports. But neither the Addendum nor the Charging Summary refers to any proceeding that might be affected by any misrepresentations. Thus, even assuming there was evidence that Stapley lied rather than made a mistake, doing so was not "material" to any proceeding and thus could not support probable cause to believe he had committed perjury. It is again unsurprising that the Charging Summary did not recommend perjury charges.

### 3.     False swearing (indictment)

As noted above, the *Stapley II* indictment did *not* pursue fraudulent schemes and artifices charges based on these unreported transfers. The indictment did include two false swearing charges (Counts 7 and 8), however, and these allegedly suspect transfers identified in the Probable Cause Addendum and discussed above appear to undergird both. *Compare* Doc. 1112-13 at 36 *with* Doc. 1073-3 at 46. Similarly, the indictment appeared to repackage the perjury charges in the same two false swearing counts (Counts 7 and 8). *See* Doc. 1112-13 at 36.

In Arizona, false swearing comprises the "making [of] a false sworn statement, believing it to be false." A.R.S. § 13-2703(A). For the same reasons discussed above,

1    however, the Addendum and Charging Summary contain no evidence showing Stapley

2    believed his disclosures were false—even if they were incorrect.

3          Arpaio and Hendershott do not point to any other consolidated evidence to support

4    probable cause for the arrest.[5]   Defendants also do not identify any specific evidence

5    developed during the three months between the arrest and the indictment that might have

6    caused MCSO or MCAO to determine that the misrepresentations in Stapley's campaign

7    finance reports were lies rather than errors—or to determine probable cause existed for

8    any of the other charges in the indictment.   It is unsurprising then that Gila County

9    Attorney Daisy Flores—to whom the *Stapley II* prosecution was conflicted out in March

10   2010—later concluded that "[a]s to all counts contained in the [*Stapley II*] indictment[,]

11   there is insufficient evidence to go forward with the prosecution . . . ."   Although Flores

12   would conclude seventeen months after MCAO indicted Stapley that "there [was]

13   sufficient evidence to prove that Stapley committed seven (7) separate felony offenses of

14   false swearing related to the NACo campaign and 2004–2008 Campaign Finance

15   Reports," Doc. 1112-16 at 32, her later conclusion is not dispositive as to what

16   Defendants knew at the time they arrested and charged Stapley.   Nor is it admissible

17   evidence as to probable cause.   There is a reasonable view of the facts that precludes

18   probable cause, and thus summary judgment is not warranted.[6]

19

20        **C.    Defendants' roles in the arrest**

21        Hendershott ordered Stapley's arrest.   *See* Doc. 1112-2 at 40, 52.   Although

22   Arpaio argues that "there is no evidence that [he] knew about any of the specific evidence

23   other than that Hendershott and others believed there was probable cause for Stapley's

---

[5] There is no merit to Arpaio's statute of limitation defense regarding the arrest.
Stapley executed a tolling agreement with the county specifically referencing A.R.S. §
12-821, *see* Doc. 1112-11 at 134–35, and Arpaio has offered no evidence that the
agreement was ever terminated.

[6] As noted above, claims for malicious prosecution are charge specific.
Consequently, even if Defendants were entitled to summary judgment that probable cause
supported the two false swearing charges in the indictment, Stapley could still try his
malicious prosecution claim based on the other twenty-five charges in the indictment.

- 44 -

1    arrest," he also concedes that "[t]here is a question of fact regarding Sheriff Arpaio's
2    involvement in Stapley's arrest, created by Hendershott saying that Sheriff Arpaio was
3    involved in making the decision to arrest Stapley."  Doc. 1139 at 4.  Neither Arpaio nor
4    Hendershott seeks summary judgment based on their roles in the arrest.

5         In contrast, Aubuchon's motion for summary judgment as to the false arrest claim
6    turns on her role in the arrest—whether she procured or induced it.  Stapley's evidence
7    demonstrates that Halverson arrested Stapley because MCSO Sergeant Rich Johnson
8    directed it at Hendershott's orders, *see* Doc. 1112-2 at 40, despite the fact Halverson
9    disagreed with the way in which the arrest was effected (in-custody arrest for a
10   nondangerous, nonviolent offense).  *Id.* at 39–40.  Although Halverson testified that
11   Aubuchon (and Hendershott) informed him that there was probable cause to arrest
12   Stapley, *see id.* at 62, this evidence falls short of demonstrating Aubuchon procured the
13   arrest, given Halverson's other testimony.  *See Lacey v. Maricopa Cnty.*, 693 F.3d 896,
14   918 (9th Cir. 2012) (en banc) (finding that special prosecutor procured arrest when he
15   "authorize[d] and advise[d]" the sheriff to arrest the plaintiff).  Aubuchon's motion for
16   summary judgment will be granted on the false arrest claim.

17

18        **D.**    **Malice or improper purpose in prosecuting *Stapley II***

19        As noted above, malice is generally a question of fact for the jury.  Malice may be
20   inferred from a lack of probable cause.  Additionally, Stapley has offered evidence that it
21   was at least contemplated that criminal indictments might strengthen the federal
22   racketeering action, which Aubuchon filed on behalf of Arpaio and Thomas a week
23   before *Stapley II*.  From this and the temporal proximity between the two, a jury could
24   infer that *Stapley II* was filed in part to lend color to the frivolous RICO action.  *See* Doc.
25   1112-3 at 140–41.  Moreover, Stapley offers Flores's letter to Thomas's successor at
26   MCAO, in which she concluded that the Stapley prosecutions, including *Stapley II*,
27   comprised a "mosaic of questionable investigative techniques and dishonorable conduct."
28   Doc. 1112-16 at 54.  In addition to chastising Aubuchon and Thomas, *see id.* at 56

1   (noting "their conduct was so egregious that we are unwilling to even attempt to justify

2   it"), she noted, "The arrest of Stapley . . . against conflict counsel's advice and three days

3   after *Stapley I* was dismissed shows vindictive intent by MCSO (Hendershott)." *Id.* This

4   and other evidence supports finding improper motive in investigating the *Stapley II*

5   prosecution. It is sufficient to defeat a motion for summary judgment.

6

7               **E.      Favorable termination**

8               As indicated above, in March 2010 Thomas conflicted the *Stapley II* prosecution

9   out to Gila County Attorney Flores. Her office conducted a fourteen-month investigation

10  in conjunction with MCSO and ultimately declined to prosecute. Generally speaking,

11  "the formal abandonment of the proceedings by the public prosecutor" constitutes

12  favorable termination. Restatement (Second) of Torts § 659(c) (1977). As noted above,

13  however, this inquiry turns on whether the termination is inconsistent with guilt.

14              Here, Flores concluded that there was "insufficient evidence to go forward" and

15  prosecute Stapley as to all counts contained in the indictment and declined to prosecute

16  Stapley "due to overriding concerns as to the investigation by [MCSO] and prosecution

17  by [MCAO]." Doc. 1112-16 at 32. Some of these concerns are articulated in the

18  preceding section. Ultimately, they led Flores to conclude that Stapley could likely

19  defeat any criminal prosecution because of the misconduct, *see id.* at 55, and that "any

20  subsequent prosecution of Stapley would be our ratification of government misconduct

21  on the part of the MCAO and the MCSO." *Id.* at 58. Her substantial concerns warranted

22  the following conclusion: "The vast record is littered with behavior so egregious that a

23  reasonable person's sense of fairness, honesty and integrity would be offended. The

24  GCAO is left with no choice but to decline this matter." *Id.* at 59. The evidence

25  precludes summary judgment that this was not a favorable termination.

26

27

28

1      **F.      Qualified immunity for the arrest**

2          Defendants are not entitled to qualified immunity for arresting Stapley "if

3  reasonable jurors could believe that Defendants violated [his] constitutional right, and the

4  right at issue was clearly established." *Torres v. City of Los Angeles*, 548 F.3d 1197,

5  1210 (9th Cir. 2008).   As discussed above, qualified immunity shields from suit the

6  officer who "makes a decision that, even if constitutionally deficient, reasonably

7  misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S.

8  194, 198 (2004).

9          As discussed above, a reasonable view of the evidence precludes finding probable

10  cause for the arrest as a matter of law.   Defendants are not entitled to qualified immunity

11  if they ordered Stapley's arrest without a reasonable belief that they had probable cause.

12  *See Lacey*, 693 F.3d at 919.   A jury could easily conclude that Arpaio and Hendershott

13  could not have reasonably believed they had probable cause to proceed given their

14  conversation with Sheila Polk almost immediately preceding the arrest.

15          Again, Polk discussed the *Stapley II* investigation with Arpaio and Hendershott the

16  Friday before the Monday arrest.   She told them she "personally had reviewed the

17  investigation involving the *Stapley II* matters, that [she] felt that there was evidence there,

18  but that [the] case was not ready to charge, that [her office] had directed the detectives to

19  do some additional investigation."   Doc. 1112-10 at 14.   She emphasized to Arpaio and

20  Hendershott that the case was "not ready to move forward."   *Id.* at 15.

21          Consequently, Polk was "shocked" when she learned that the very next business

22  day—Monday, September 21, 2009—Arpaio and Hendershott ordered the arrest despite

23  the prosecutor in charge of the case advising them to the contrary.   *Id.* at 13, 15.   The

24  arrest prompted Polk to ask Arpaio to take MCSO off the case because she did not

25  believe "he could proceed impartially with the cases."   *Id.* at 16.   She subsequently

26  published an editorial in the *Arizona Republic* entitled "Arpaio, Thomas are abusing

27  power," which responded to charges against Stapley and others by chastising Arpaio and

28

Thomas that "[p]rosecutors are ethically bound to refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause."  *Id.* at 2–3.

Moreover, despite the requirement that an arrestee be charged within two days of his arrest, no prosecuting agency brought charges against Stapley until three months later when the *Stapley II* indictment was filed.  MCAO did not bring charges following the arrest since the case had been conflicted out to the Yavapai County Attorney's Office.  And YCAO had already expressed to Arpaio and Hendershott that the case was not ready to charge.

From all this, a jury could conclude that Arpaio and Hendershott never had probable cause to order a warrantless arrest of Stapley—and that any misapprehension that they did have probable cause was patently unreasonable given the surrounding events.

## VI.    THE RACKETEERING ACTION

On December 1, 2009, Aubuchon and Thomas filed a federal civil racketeering action on behalf of Arpaio and Thomas.  The complaint named as defendants Stapley, the rest of the Board of Supervisors, County Manager David Smith, Deputy County Manager Sandi Wilson, and four Arizona Superior Court judges, among others.  The complaint centered on "a concerted scheme to hinder the criminal investigation and prosecution of elected officials and employees of Maricopa County . . . ."  Doc. 1073-4 at 50.

Stapley's first claim for relief seeks damages against all the individual Defendants for their involvement in the racketeering action.  Defendants Arpaio and Hendershott seek summary judgment that they did not wrongfully institute civil proceedings against Stapley.  Stapley seeks summary judgment that Hendershott is liable.

### A.    Background

The exact origin of the civil racketeering action is nebulous.  In early September 2009, the law firm Ogletree Deakins was retained to determine whether the authority of

1    the Board of Supervisors could be placed "with a receiver for 'misfeasance and

2    malfeasance in office.'"  Doc. 1112-3 at 108.  Olgetree, and in particular attorney Eric

3    Dowell, undertook this assignment after appointment by the Maricopa County Office of

4    Special Litigation Services "to represent the Maricopa County Sheriff" in an action

5    against the Board.  Doc. 1112-11 at 55.  On the same day Stapley was arrested, one of

6    Dowell's associates began researching removal of elected officials from office.  *See* Doc.

7    1112-3 at 108.  Dowell testified that Hendershott acted as the client contact within

8    MCSO, *see id.* at 104–05, and that Arpaio informed Dowell that Hendershott was

9    authorized to act on behalf of MCSO.  *See id.* at 1112-3 at 105–06.

10       Eventually, "Ogletree was asked to research a potential racketeering lawsuit

11   against members" of the Board.  *Id.* at 111.  Emails and memoranda in late October and

12   early November 2009 among Ogletree lawyers and between them and Peter Spaw, an

13   MCAO attorney considered the office's "RICO expert," *see* Doc. 1112-12 at 37, reflect

14   Ogletree's conclusion MCSO probably could not maintain a RICO action against the

15   Board.  *See* Doc. 1112-11 at 142–48.  At several points, Hendershott offered to Ogletree

16   lawyers hypothetical acts by Board members and questioned whether such acts could

17   sustain or strengthen the racketeering action.  *See* Doc. 1112-3 at 118–19.  As early as

18   October 30, 2009, Peter Spaw had summed up Ogletree's advice to Hendershott: "You

19   can't do this," Doc. 1112-12 at 34–35, although Hendershott testified he did not recall

20   speaking to Spaw about the RICO action at that time.  *See id.* at 78.  By late November

21   2009, Ogletree lawyers had advised Hendershott several times against the racketeering

22   charges.  *See* Doc. 1112-3 at 116.

23       MCAO attorneys also expressly condemned the idea.  Hendershott emailed Sally

24   Wells, MCAO's third in command, Phil MacDonnell, MCAO's second in command, and

25   Thomas—all regulars at MACE meetings, *see* Doc. 1112-12 at 43—on November 3 that

26   Arpaio was "all good with the civil rico" action.  *Id.* at 37.  MacDonnell responded the

27   next day to Thomas that "[t]he idea of a civil RICO action based on current evidence is

28   unfounded.  Peter Spaw, our RICO expert, thinks it makes no sense. . . . It would be a

misuse of the law . . . ." *Id.*; *see also* Doc. 1112-8 at 51–53. The advice of MCAO deputies led Thomas to state that the racketeering action would not be filed and that he would let Dowell "deliver the bad news to Hendershott." *Id.* at 53. Nonetheless, in mid-November, Aubuchon began drafting the complaint and provided it to Thomas. *See* Doc. 1112-7 at 51.

On December 1, 2009, Aubuchon filed a federal civil racketeering action that named Arpaio and Thomas as plaintiffs. *See* Doc. 1073-4 at 49; Doc. 1112-12 at 141–42. Hendershott testified that he was never involved in the decision to file it. *See* Doc. 1112-12 at 77. Both MCAO and MCSO then approached Ogletree about taking over the representation of the filed action. *See id.* at 96 (Dowell email indicating Hendershott sought representation for plaintiffs in "nuclear bomb" RICO action); *id.* at 123–25 (Dowell testimony indicating that Sally Wells contacted him after the filing regarding representation). Ogletree declined to undertake the representation and put in an appearance, *see* Doc. 1112-3 at 122–23, 130, although it agreed to provide "background" counsel to MCAO. *Id.* at 133. In January, Dowell recommended the action be dismissed. *Id.* at 152. MCAO then fired Ogletree. *Id.* at 155.

Around the same time, MCSO hired Robert Driscoll of Alston & Bird to represent Arpaio. *See* Doc. 1073 at 11. Indeed, on December 31, 2009, Aubuchon had written to Driscoll, "I understand Chief Hendershott spoke to you this morning about assisting our offices" with the motions to dismiss the RICO action. Doc. 1112-12 at 104. She followed that up with a copy of the complaint, which Driscoll forwarded to an associate and referred to as an "excuse for a pre-noontime scotch" and "pretty freakin thin." *Id.* at 106–08. Nonetheless, Driscoll testified he believed the complaint satisfied Rule 11. *See* Doc. 1073 ¶ 65.

In early March, Driscoll recommended to Hendershott that they refer the matter to the Department of Justice's public integrity section and dismiss the action. *See* Doc. 1112-12 at 117–18. Although he did not rule out a RICO action altogether, he communicated to MCSO that the chances of success were "way south of 50 percent." *Id.*

1    at 118.   Arpaio and Thomas agreed, dismissed the RICO action, and referred the

2    underlying matters to DOJ.  *See* Doc. 1073 ¶ 65.

3           Arpaio and Hendershott have moved for summary judgment that they are not

4    liable for wrongful litigation for their respective roles in the racketeering action.

5

6           **B.      Legal standard**

7           To prove wrongful institution of civil proceedings, Stapley must demonstrate

8    Defendants (1) instituted a civil action, (2) motivated by malice, (3) begun or maintained

9    without probable cause, and which (4) terminated in his favor and (5) damaged him.  *See*

10   *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 416–17, 758 P.2d 1313,

11   1318–19 (1988).

12          Because Aubuchon's RICO complaint was, as this Court has previously noted,

13   frivolous on its face, Arpaio and Hendershott are entitled to summary judgment only if

14   they were insufficiently involved in the case as a whole, they sufficiently relied on advice

15   of counsel notwithstanding that the suit was meritless, there is no evidence from which a

16   reasonable jury could find malice, or the dismissal of the action in 2010 did not constitute

17   a favorable termination.

18

19          **C.      Analysis**

20                 **1.      Involvement**

21          Liability may attach to a person who initiates, continues, or procures wrongful

22   civil proceedings.  *See* Restatement (Second) of Torts § 674 (1977).   "The person who

23   initiates civil proceedings is the person who sets the machinery of the law in motion," *id.*

24   at 674 cmt. a, and "one who procures the initiation of civil proceedings is liable under the

25   same conditions as the one who initiates them."  *Id.* at 674 cmt. b.

26          Here, despite having "no memory of seeing the complaint" before Aubuchon filed

27   it, it is undisputed that Arpaio agreed to serve as a plaintiff in the RICO lawsuit.  *See*

28   Doc. 1062 at 7.  Moreover, a reasonable jury could determine that Hendershott took "an

1    active part" in initiating, procuring, or continuing the RICO action despite not being

2    named as a plaintiff.  Arpaio was named as a plaintiff in his official capacity as head of

3    MCSO.  As noted above, Dowell testified that Hendershott acted as the client contact and

4    that he was authorized to act on behalf of MCSO.  Hendershott repeatedly corresponded

5    with Ogletree lawyers to strategize ways to maintain or strengthen the racketeering

6    action.  Indeed, when Thomas appeared initially to disfavor a RICO action, he decided to

7    let Ogletree lawyer Eric Dowell "deliver the bad news to Hendershott."  Doc. 1112-8 at

8    53.  Finally, when Aubuchon initially corresponded with Driscoll regarding Alston &

9    Bird assisting MCAO in responding to motions to dismiss the RICO action, she appeared

10   to be following up on an earlier phone call between Driscoll and Hendershott.  *See* Doc.

11   1112-12 at 104.   Viewing the evidence most favorably to Stapley, Hendershott's

12   involvement was sufficient for liability for procuring wrongful litigation.

13

14                    **2.        Probable cause (reasonable belief and advice of counsel)**

15            Defendants had probable cause to initiate, continue, or procure the suit if they

16   "reasonably believe[d] in the existence of the facts upon which the claim [was] based"

17   and "reasonably believe[d] that under those facts the claim may be valid" or "believe[d]

18   to this effect in reliance upon the advice of counsel."  Restatement (Second) of

19   Torts § 675.  Counsel's advice must be "sought in good faith and given after full

20   disclosure of all relevant facts within his knowledge and information."  *Id.*  Finally, "the

21   advice of counsel is a protection only if the client who consults him has no reason to

22   know that the attorney is himself interested in the result of the proceedings," *id.* at 675

23   cmt. h, and only if the client does not shop lawyers for a favorable opinion.  *See id.* § 666

24   cmt. e.

25            Defendants cannot establish as a matter of law that their belief in the merits of the

26   RICO action was reasonable either at the time it was filed or after.  Ogletree lawyers

27   expressed serious doubt to Hendershott about the viability of a RICO action on multiple

28   occasions.  Further, there is evidence MCAO attorney Peter Spaw also told Hendershott

1   he could not maintain the action.  Arpaio concedes he never read the RICO complaint,

2   *see* Doc. 1069 ¶ 22, and "did not know the 'nuts and bolts' of the facts or allegations."

3   Doc. 1139 at 5.

4          Moreover, Defendants cannot rely on Thomas's advice supporting the RICO

5   action.  As a threshold matter, the facts are in dispute as to whether Thomas thought it

6   was justified.  Although Defendants offer evidence that Thomas believed the RICO case

7   against the Board was strong, *see* Doc. 1073-4 at 73, there is also evidence, described

8   above, that Thomas's second-in-command, MacDonnell, told Thomas the RICO action

9   "would be a misuse of the law" and that this prompted Thomas to choose at one point not

10  to file it.  Additionally, Hendershott fired Ogletree after they provided negative advice,

11  and he then shopped the case to another law firm.  Finally, Thomas was named as a

12  plaintiff and the complaint sought redress for threats allegedly made against Thomas and

13  his wife.  *See* Doc. 1073-4 at 50–51.  Hendershott and Arpaio knew Thomas was

14  interested in the proceeding.  The evidence defeats summary judgment for Defendants on

15  the defense of advice of counsel.

16

17                     **3.      Malice**

18          Stapley and Hendershott agree that the question of malice should go to a jury.

19  *Compare* Doc. 1123 at 54 (Stapley asserting that "[a] jury should be permitted to

20  determine whether Defendants' actions [with respect to the RICO action] were

21  improper . . . .") *with* Doc. 1110 at 5 (Hendershott asserting that "[t]here is no question

22  that genuine disputes on the issue of malice exist requiring the jury to weigh the evidence

23  and credibility of witnesses before making a determination.").

24          Whether malice motivated Arpaio turns largely on resolving how Thomas advised

25  him (given conflicting evidence about what Thomas thought) and what information

26  Hendershott relayed from Ogletree and Spaw.  *Compare* Doc. 1139 at 5 ("[Arpaio] did

27  not know the 'nuts and bolts' of the facts or allegations.") *with* Doc. 1112-3 at 157–58

28  (Dowell testifying that he spoke with Arpaio, whose knowledge was consistent with

1   receiving updates from Hendershott) *and* Doc. 1073-4 at 71 (Thomas testifying that he

2   discussed the complaint with Arpaio before he filed it).  Arpaio chose to serve as plaintiff

3   in a meritless federal racketeering action against elected officials and sitting judges.  He

4   did so without ever reading the complaint or familiarizing himself with the facts or

5   allegations underlying it—instead, he "discussed it" with Thomas and relied on him.

6   Doc. 1069 ¶¶ 20–21.  There is sufficient evidence to support a jury finding of malice,

7   precluding summary judgment.

8

9                    **4.      Favorable termination**

10          "Civil proceedings may be terminated in favor of the person against whom they

11  are brought. . . by . . . the withdrawal of the proceedings by the person bringing them."

12  Restatement (Second) of Torts § 674 cmt. j.  Indeed, "where there has been no

13  adjudication on the merits the existence of a 'favorable termination' of the prior

14  proceeding generally must be found in the substance rather than the form of prior events

15  and often involves questions of fact."  *Frey v. Stoneman*, 150 Ariz. 106, 111, 722 P.2d

16  274, 279 (1986).

17          "In determining the effect of withdrawal the same considerations are decisive as

18  when criminal charges are withdrawn; and therefore §§ 660-661 and 665, and the

19  Comments under those Sections are pertinent to this Section."  Restatement (Second) of

20  Torts § 674 cmt. j.  "The abandonment of the proceedings because the accuser believes

21  that the accused is innocent or that a conviction has, in the natural course of events,

22  become impossible or improbable, is a sufficient termination in favor [of] the accused."

23  *Id.* § 660 cmt. d.  Ultimately, "when the circumstances surrounding the termination of the

24  prior proceedings are ambiguous, the determination of those circumstances belongs to the

25  factfinder."  *Frey*, 150 Ariz. at 111, 722 P.2d at 279.

26          By March 2010, Driscoll was advising Arpaio and Thomas to dismiss the RICO

27  complaint and refer the underlying matters to the public corruption unit at the Department

28  of Justice.  *See* Doc. 1112-12 at 117–18.  Although Driscoll believed the complaint met

the pleading requirements of Rule 11, Driscoll's testimony establishes that he ultimately believed the RICO complaint would not survive—that there would be a "nasty" dismissal. *Id.* at 128. And emails between Alston & Bird lawyers reflect that Driscoll at least at one point believed the RICO complaint was "pretty freakin thin—like anorexic," *see id.* at 108, and "an excuse for a pre-noontime scotch." *Id.* at 106.

Further, there is disputed evidence that Driscoll recommended referral to DOJ to avoid "admitting that there is no basis to those claims." *Id.* at 124. This is consistent with internal Alston & Bird emails reflecting that the referral to DOJ was intended in part "to make it clear that this isn't an admission that the complaint was a piece of crap." *Id.* at 110.

This is ample evidence that Arpaio and Thomas dismissed the RICO action because success was improbable. As a result, the termination was favorable, or a jury could so find. For the foregoing reasons, Arpaio and Hendershott are not entitled to summary judgment on the RICO action.

## VII.   RETALIATION AND QUALIFIED IMMUNITY

Stapley's eighth claim for relief in his Second Amended Complaint named each individual Defendant and sought redress for "retaliatory conduct for his political speech"—a violation of 42 U.S.C. § 1983. Doc. 246 ¶ 290. "A plaintiff may bring an action under § 1983 to redress violations of his 'rights, privileges, or immunities secured by the Constitution and [federal] laws' by a person or entity, including a municipality, acting under the color of state law." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). Stapley incorporated the matters underlying his individual claims—the *Stapley I* prosecution, the search, the arrest, the *Stapley II* indictment, and the RICO action—and alleged a First Amendment violation. *See* Doc. 246 ¶ 289–90. The complaint also incorporated conduct not alleged as individual causes of action. *See* Doc. 246 at 289–90.

1    Stapley's briefing clarifies the grounds for his retaliation claim.  "It is premised

2    upon the Defendants' 15 retaliatory, and well-publicized investigations of him, which

3    spanned three years, and included, but was not limited to, the searches of his and the

4    Wolfswinkels' offices; the RICO Lawsuit; and, Sheriff Arpaio and Hendershott's

5    retaliatory *Stapley I* and *II* prosecutions and orders to arrest Supervisor Stapley."  Doc.

6    1112 ¶ 14; *see also* Doc. 1123 at 69 (referring to "the over-arching three-year

7    investigation and media campaign" as the basis for the retaliation claim).

8

9    **A.    Constitutional violation**

10    Stapley alleges that Defendants investigated, prosecuted, and otherwise harassed

11    him in retaliation for "speaking to the media, otherwise engaging in political speech, or

12    opposing them in the courts."  Doc. 1123 at 61.  He asserts their conduct violated his

13    "First Amendment right not to be investigated as a result of . . . valid free speech

14    activity."  Doc. 1145 at 26.

15    "[T]he First Amendment prohibits government officials from subjecting an

16    individual to retaliatory actions . . . for speaking out."  *Hartman v. Moore*, 547 U.S. 250,

17    256 (2006).  "[T]o demonstrate a First Amendment violation, a plaintiff must provide

18    evidence showing that 'by his actions the defendant deterred or chilled the plaintiff's

19    political speech and such deterrence was a substantial or motivating factor in the

20    defendant's conduct.'"  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 916 (9th Cir. 2012) (en

21    banc) (alterations omitted) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d

22    1283, 1300 (9th Cir. 1999)).

23    Stapley must first prove Defendants' "acts would chill or silence a person of

24    ordinary firmness from future First Amendment activities," *id.* (quoting *Crawford–El v.

25    Britton*, 93 F.3d 813, 826 (D.C.Cir.1996), *vacated on other grounds*, 520 U.S. 1273

26    (1997), but he need not demonstrate that "his speech was actually inhibited or

27    suppressed."  *Id.* (quoting *Mendocino Envtl. Ctr.*, 192 F.3d at 1300).  Second, he must

28

"'prove the elements of retaliatory animus as the cause of injury,' with causation being 'understood to be but-for causation.'"  *Id.* at 917 (quoting *Hartman*, 547 U.S. at 260).

On this record, the Court has no trouble finding sufficient evidence that Defendants' retaliatory animus substantially motivated their investigation of Stapley. The record is replete with instances of action against Stapley in close proximity to his criticism of their efforts and his success in their litigation against him.  For example, MCAO reopened the dormant *Stapley I* investigation just two months after Stapley criticized Thomas's use of public funds to produce "self-promoting" pamphlets, *see* Doc. 1112 ¶ 61, and MCSO's expenditures.   Indeed, there is evidence that Hendershott expressly threatened that MCSO would "get" him near the same time Defendants revived the *Stapley I* investigation.   Perhaps most egregiously, MCSO arrested him the next business day after he prevailed in *Stapley I*, despite the prosecuting attorney admonishing Arpaio and Hendershott that the case was not ready to proceed.  At around the same time, MCSO began researching the civil suit that would become the RICO action.  A jury could reasonably conclude that Defendants' retaliatory animus was the but-for cause of their investigations.

Moreover, "a retaliatory police action such as an arrest or search and seizure would chill a person of ordinary firmness from engaging in future First Amendment activity."  *Ford*, 706 F.3d at 1193.  Here, a jury could conclude that Defendants sent a clear message to Stapley by, among other actions, effecting a warrantless arrest on new charges the next business day after he won a partial victory in *Stapley I*.  A jury could similarly conclude that this message would chill a person of ordinary firmness— particularly one without Stapley's political clout and resources—from criticizing the Defendants and vigorously litigating against them.   These facts preclude summary judgment for Defendants.

1       **B.**     **Clearly established right**

2       As discussed above, Defendants are entitled to qualified immunity if, viewing the

3 facts in the light most favorable to Stapley, they did not violate a clearly established

4 constitutional right. Stapley specifically claims a right "not to be retaliated against

5 through an investigation," *see* Doc. 1123 at 63, notwithstanding the presence of probable

6 cause. *See id.* at 61, 63.

7       As a threshold matter, "[t]he initiation of a criminal investigation in and of itself

8 does not implicate a federal constitutional right. The Constitution does not require

9 evidence of wrongdoing or reasonable suspicion of wrongdoing by a suspect before the

10 government can begin investigating that suspect." *Rehberg v. Paulk*, 611 F.3d 828, 850

11 n.24 (11th Cir. 2010), *aff'd*, 132 S. Ct. 1497 (2012).

12       Similarly, the Supreme Court has not recognized a constitutional right to be free of

13 either retaliatory arrest or retaliatory prosecution if they are supported by probable cause.

14 *See Reichle v. Howards*, __ U.S. __, 132 S.Ct. 2088, 2093 (2012) (noting the Supreme

15 Court "has never recognized a First Amendment right to be free from a retaliatory arrest

16 that is supported by probable cause"); *Hartman*, 547 U.S. at 252 (holding that plaintiffs

17 must allege and prove lack of probable cause in an action for retaliatory prosecution).

18       Notwithstanding this precedent, the Ninth Circuit concluded in *Ford v. Yakima*

19 that its "2006 decision in *Skoog* established that an individual has a right to be free from

20 retaliatory police action, even if probable cause existed for that action." 706 F.3d 1188,

21 1195–96 (9th Cir. 2013). In *Skoog v. County of Clackamas*, the Ninth Circuit resolved an

22 "open question" and concluded that "a plaintiff need not plead the absence of probable

23 cause in order to state a claim for retaliation." 469 F.3d 1221, 1232 (9th Cir. 2006).

24 There, a police officer executed a search warrant and seized the plaintiff's property after

25 the plaintiff sued a different officer, and the plaintiff asserted claims against him for

26 violations of both the Fourth and First Amendments. After determining that probable

27 cause existed for the search and granting qualified immunity on the Fourth Amendment

28

claim, the court nonetheless concluded that the plaintiff stated the elements of First Amendment retaliation.  *Id.* at 1235.

Subsequently in *Ford*, the court reversed a grant of qualified immunity to a police officer after he booked and jailed a plaintiff for criticizing a traffic stop, which was supported by probable cause but which plaintiff believed was racially motivated.  706 F.3d at 1193.  It noted that "[a]t the time the officers acted in 2007, the law in this Circuit gave fair notice that it would be unlawful to jail Ford in retaliation for his First Amendment activity."  *Id.* at 1195.  Notwithstanding *Ford* and *Skoog*, one Ninth Circuit panel has subsequently held officers entitled to qualified immunity for making a retaliatory arrest because it was supported by probable cause.  *See Acosta v. City of Costa Mesa*, 718 F.3d 800, 825 (9th Cir. 2013) (quoting *Reichle* approvingly).

This Court need not unravel the tangle of Ninth Circuit and Supreme Court precedents on probable cause in First Amendment retaliation claims.  As discussed extensively above, a reasonable jury could find facts amounting to a lack of probable cause for the criminal prosecutions, the search, the arrest, and the civil RICO action.  Recurring disputes of fact preclude finding probable cause as a matter of law.  Therefore, summary judgment would have to be denied even if the cause of action requires lack of probable cause.  Whether Stapley must prove a lack of probable cause would not affect the ruling on these motions and need not be decided until the jury is instructed.  And even then the jury might find lack of probable cause, thus mooting the question here and on appeal.

The Court also construes the First Amendment retaliation cause of action more narrowly than Stapley does.  There is no cause of action for wrongful police investigation as such (though separate torts might be committed in the course of investigation).  Settled causes of action for malicious prosecution, tortious search, false arrest, and wrongful civil litigation set boundaries for the appropriate protection of police and prosecutors, and the Court reads the First Amendment retaliation cause of action as confined by those same boundaries, for the same reasons of policy.  The Court holds that the First Amendment

claim otherwise replicates the elements and immunities of the underlying claims for malicious prosecution, tortious search, false arrest, and wrongful civil RICO litigation, putting aside for now the disputed requirement of lack of probable cause because it need not be resolved on these motions and would not result in summary judgment on this record.

What remains of the retaliation claim will not change or add to the preparation and trial of this case as it would be without the surviving retaliation claim.  Trial of Stapley's retaliation claim will not expand the evidence beyond the evidence for his underlying causes of action.  Though retaliatory purpose must be proved, the evidence of that is the same as the evidence of malice, which is otherwise an issue for trial.  The Court will limit the evidence under Rule 403, Fed. R. Evid, to what is direct, probative, and efficient.

As a result, allowing the retaliation claim to proceed against Arpaio and Hendershott for their roles in the investigation and prosecution and against Thomas and Aubuchon for their nonprosecutorial actions narrowly comports with the spirit of protecting police officers and public prosecutors.  Other than Thomas's and Aubuchon's claims to absolute immunity, Defendants are not entitled to summary judgment on the retaliation claim as it is narrowed in this order.


**XIII.  ABSOLUTE IMMUNITY**

Defendants Thomas and Aubuchon seek summary judgment that they are entitled to absolute immunity for their roles in the criminal prosecutions (*Stapley I* and *II*) and the search.  *See* Doc. 1063 at 5–6, 11 n.8; Doc. 1066 at 6–7, 13–14.  Because Stapley's individual claims for malicious prosecution based on *Stapley I* and *II* fail as to Thomas and Aubuchon, and because Thomas is entitled to summary judgment against Stapley's judicial deception claim, the only issue is whether Aubuchon has absolute immunity for the search.

### A.   Legal standard

Prosecutors performing prosecutorial functions—the "traditional functions of an advocate"—are entitled to absolute immunity from liability for damages under § 1983. *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).  When a prosecutor instead performs "administrative functions or 'investigative functions normally performed by a detective or police officer,'" he is entitled not to absolute immunity but to qualified immunity.  *Id.* (quoting *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997)).  But the contours of absolute immunity are nuanced.  For example, when an investigation is conducted to collect evidence of crimes for which a defendant has already been indicted, such investigatory action is deemed prosecutorial by nature; thus, a prosecutor engaged in such investigation is afforded absolute immunity.  *KRL v. Moore*, 384 F.3d 1105, 1111 (9th Cir. 2004); *see also Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003).  A "collateral investigation," however, that goes "beyond any legitimate preparation to prosecute" a defendant who has been indicted rings more of police work than of prosecutorial work. *KRL*, 384 F.3d at 1113.  "Like advising officers about the existence of probable cause during the pretrial investigation, . . . approving a search warrant to assist with a collateral investigation into new crimes is an investigative function that is not entitled to absolute immunity."  *Id.* (internal citation omitted).  Similarly, a prosecutor who provides legal advice to police during the "investigative phase of a criminal case" is not afforded absolute immunity.  *Burns v. Reed*, 500 U.S. 478, 493 (1991).

"[A]bsolute freedom from the threat of unfounded lawsuits . . . is the rare exception to the rule."  *Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.*, 812 F.2d 1154, 1158 (9th Cir. 1987).  The burden of demonstrating absolute immunity falls on the official seeking it.  *Genzler*, 410 F.3d at 636 (quoting *Burns*, 500 U.S. at 486).

### B.   Analysis

Application of absolute immunity to the search thus turns on whether it was an investigation intended to collect evidence for crimes for which Stapley had already been

1    indicted or whether it was a "collateral investigation."  Thus, if the search was conducted

2    to collect evidence of the crimes charged in *Stapley I*, then Aubuchon is entitled to

3    absolute immunity.  If, on the other hand, the search was intended to investigate new

4    crimes (such as those composing the later *Stapley II* charges), then absolute immunity is

5    inapplicable.

6          Defendants' disagree on whether MCSO sought the search warrant to further the

7    *Stapley I* investigation or the *Stapley II* investigation.  Aubuchon asserts that "[t]he search

8    of Stapley's office was the result of and in furtherance of the Stapley I indictment."  Doc.

9    1130 at 4; *see also* Doc. 1106 at 5 ("The Stapley search warrant served to support the

10   then-pending Stapley I case.").  In contrast, Hendershott submitted the search warrant

11   affidavit into the record and labeled it "Exhibit F: Stapley II Search Warrant."  Doc.

12   1073-2 at 1.  Thomas appears ambivalent as to the relationship between *Stapley I*, the

13   search, and *Stapley II*.  *Compare* Doc. 1063 at 8 ("There is no evidence that Stapley was

14   ever searched or seized within the meaning of the Fourth Amendment as a result of

15   Stapley I or II . . .") *with* Doc. 1064 ¶ 20 ("The search warrant of the office was a part of

16   the ongoing investigation from Stapley I that led to the Stapley II charges.").

17         The search warrant itself, however, belies any assertion that it furthered the

18   *Stapley I* investigation.  The first indictment was premised on Stapley ostensibly violating

19   disclosure laws.  In contrast, the search warrant expressly sought evidence that Stapley

20   was involved in bribery and the knowing misuse of public funds.  This is consistent with

21   Arpaio's assertion that "[t]he Stapley II matter was a totally separate investigation and

22   prosecution from the Stapley I matter."  Doc. 1102 at 2.  Consequently, the search

23   warrant implicated "a collateral investigation into new crimes" and thus constituted "an

24   investigative function that is not entitled to absolute immunity," or the jury could so find

25   from the evidence.  *KRL*, 384 F.3d at 1113.  Aubuchon is not entitled to summary

26   judgment based on absolute immunity.

27

28

1  **IX.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND PUNITIVE**

2  **DAMAGES**

3      Stapley asserts a claim for intentional infliction of emotional distress and seeks

4  punitive damages.  *See* Doc. 246 at 40.  Both claims turn on a showing that Defendants

5  conduct was outrageous and either intentional or reckless.  All Defendants seek summary

6  judgment that Stapley is not entitled to put the claims to a jury.

7

8      **A.  Legal standard**

9      To recover for intentional infliction of emotional distress, a plaintiff must

10  demonstrate (1) extreme and outrageous conduct; (2) intent to cause emotional distress or

11  reckless disregard for its near certainty; and (3) severe emotional distress resulting from

12  the defendants' conduct.  *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585

13  (1987).  "To establish that the conduct was sufficiently 'extreme' or 'outrageous,' a

14  plaintiff must show that it was 'so outrageous in character, and so extreme in degree, as

15  to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly

16  intolerable in a civilized community.'"  *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1061

17  (D. Ariz. 2012), *aff'd sub nom. Stapley v. Pestalozzi*, 733 F.3d 804 (9th Cir. 2013)

18  (quoting *Johnson v. McDonald*, 197 Ariz. 155, 160, 3 P.3d 1075, 1080 (Ct. App. 1999)).

19      For punitive damages to be awarded under Arizona law, "there must be evidence

20  of an 'evil mind' and aggravated and outrageous conduct."  *Linthicum v. Nationwide Life*

21  *Ins. Co.*, 150 Ariz. 326, 331, 723 P.2d 675, 680 (1986).  The evidence in this case

22  supports such a finding.  However, by statute "[n]either a public entity nor a public

23  employee acting within the scope of his employment is liable for punitive or exemplary

24  damages."  Ariz. Rev. Stat. Ann. § 12-820.04.  Nonetheless, punitive damages may be

25  awarded in a § 1983 action when "evil motive or intent" motivates the defendants'

26  conduct or their conduct manifests "reckless or callous indifference to the federally

27  protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

28

### B.      Analysis

As the above analysis indicates, Stapley has offered sufficient evidence from which a jury could conclude that Defendants acted outrageously and either intended Stapley harm or were recklessly indifferent to whether their actions would infringe on his rights and cause him severe distress.  Defendants are not entitled to summary judgment as to either intentional infliction of emotional distress or punitive damages.  Nonetheless, Stapley may not use his intentional infliction claim to tell a broad story untethered from the causes of action described herein or to cast aside the boundaries they draw.  Stapley's intentional infliction claim duplicates his other surviving causes of action.  It may not circumvent their strictures.   The Court can prevent that more effectively through limitation of evidence under Rule 403 and carefully crafted jury instructions than through summary judgment.

## X.    UNCONSTITUTIONAL POLICIES OR CUSTOMS

Stapley concedes that all § 1983 claims for unconstitutional policies and procedures are against Defendant Maricopa County.  *See* Doc. 1112 ¶ 13.  Nor does he contest Arpaio's and Hendershott's motions for summary judgment with respect to claims for failure to train and negligent supervision.   *See generally* Doc. 1123.  Consequently, summary judgment will be granted against the claims in the ninth cause of action (unconstitutional policies and customs, failure to train, and negligent supervision) as against the individual Defendants.

## XI.    PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

Stapley has moved for summary judgment that Arpaio arrested him for retaliatory purposes in violation of § 1983, that Hendershott initiated the RICO action in violation of § 1983 and state law, and that Aubuchon caused a search warrant to be executed without probable cause in violation of § 1983.

1    Stapley has provided ample evidence to support the conclusion that Defendants'
2  actions lacked probable cause.   Nonetheless, the existence of factual questions and
3  considerations of economy militate against summary judgment.   Granting any of his
4  motions would not shorten the trial.

5

6    IT IS THEREFORE ORDERED denying Plaintiff Stapley's Motions for Partial
7  Summary Judgment (Docs. 1056, 1060, and 1065).

8    IT IS FURTHER ORDERED granting Defendant Arpaio's Motion for Summary
9  Judgment (Doc. 1062) against Stapley's ninth claim for unconstitutional policies,
10  customs, failure to train, and negligent supervision.   The motion is otherwise denied.

11    IT IS FURTHER ORDERED granting Defendant Aubuchon's Motion for
12  Summary Judgment (Doc. 1066) against Stapley's second and fifth claims for malicious
13  prosecution and against his fourth claim for false arrest.   The motion is otherwise denied.

14    IT IS FURTHER ORDERED granting Defendant Hendershott's Motion for
15  Summary Judgment (Doc. 1072) against Stapley's ninth claim for unconstitutional
16  policies, customs, failure to train, and negligent supervision.   The motion is otherwise
17  denied.

18    IT IS FURTHER ORDERED granting Defendant Thomas's Motion for Partial
19  Summary Judgment (Doc. 1063) against Stapley's second and fifth claims for malicious
20  prosecution and against his tenth claim for unlawful search.   The motion is otherwise
21  denied.

22    Dated this 5th day of December, 2013.

23

24

25  _____

26  Neil V. Wake
   United States District Judge

27

28

- 65 -